**Charles L. GRIMES, Plaintiff,**

v.

**DSC COMMUNICATIONS CORPORATION, a Delaware corporation, Defendant.**

**C.A. No. 16145–NC.**

Court of Chancery of Delaware, New Castle County.

Submitted: May 11, 1998.
Decided: Aug. 5, 1998.

---

David A. Jenkins, of Smith, Katzenstein & Furlow, LLP, Wilmington, for Plaintiff.

Stephen E. Jenkins, of Ashby & Geddes, Wilmington; Brian J. Hurst (argued) and Patricia G. Hubbard, of Baker & McKenzie, Dallas, Texas, for Defendant.

## OPINION

LAMB, Vice Chancellor.

### I. INTRODUCTION

Plaintiff, Charles L. Grimes, filed this action on January 15, 1998 pursuant to 8 *Del. C.* § 220 seeking the inspection of certain books and records of the defendant, DSC Communications Corp. ("DSC"), a Delaware corporation.[1] Plaintiff seeks access to documents relating to (i) the formation, investigation and report of the Special Committee appointed by DSC to investigate a pre-suit demand the plaintiff made on June 5, 1996; and (ii) the DSC board's decision to accept the Special Committee's recommendation to reject the plaintiff's pre-suit demand. DSC refuses to provide certain of these documents, asserting various arguments in defense. Trial was held on May 11, 1998. For the reasons stated herein, I will grant the plaintiff's request, in part, and order DSC to produce the documents or categories of documents identified in this opinion.

### II. BACKGROUND

A. *Plaintiff's First Demand on Board*

In September 1993, the plaintiff made a demand on DSC's board of directors to rescind the compensation package DSC awarded to its CEO, James Donald, in 1990.

---

1. Plaintiff is the record owner of approximately 1,000 shares of common stock of DSC.

Plaintiff asserted that certain unusual terms of the compensation package amounted to an unlawful abdication of the directors' managerial duties. The board refused the demand and, in November 1993, Grimes filed a derivative lawsuit in this Court against DSC and the directors. In addition to asserting the claim for unlawful abdication of duty, the complaint alleged that Donald's compensation package constituted waste, excessive compensation, and was the product of a lack of due care.

The Court granted the defendants' motion to dismiss the claim alleging an abdication of directorial duty for failure to state a claim upon which relief can be granted. *Grimes v. Donald*, Del.Ch., C.A. No. 13358, Allen, C., 1995 WL 54441 (Jan. 11, 1995), *aff'd* 673 A.2d 1207 (1996). The Court also dismissed the claims for waste, excessive compensation and lack of due care for failure to make a pre-suit demand, holding that Grimes waived the right to allege that demand was excused as to these claims when he made a pre-suit demand on the abdication of duty claim.

In affirming, the Supreme Court noted that the plaintiff was not barred from making another demand on the board as to those claims for which he had not made a pre-suit demand. Further, the Supreme Court stated that a "stockholder who makes a serious demand and receives only a peremptory refusal has the right to use the 'tools at hand' to obtain the relevant corporate records, such as reports or minutes, reflecting the corporate action and related information in order to determine whether or not there is a basis to assert that demand was wrongfully re-

fused." *Grimes*, 673 A.2d at 1218 (citations omitted).

### B. *Plaintiff Makes Second Demand on Board*

On June 5, 1996, following the Supreme Court's decision, the plaintiff made a second demand on the DSC board to avoid or abrogate Donald's 1990 compensation package, as well as his 1994 Long–Term Incentive Compensation Plan. By letter dated May 20, 1997,[2] DSC advised Grimes that the board of directors had rejected his demand. According to that letter, the following occurred. In response to this second demand, the board of directors formed a Special Committee made up of two outside directors, to investigate the allegations underlying the demand.[3] Based upon its investigation and findings, the Special Committee recommended to the DSC board that it reject the demand. On April 30, 1997, the DSC board accepted the recommendation of the Special Committee, thus rejecting his demand.

### C. *Plaintiff Makes Section 220 Demand*

On June 12, 1997, after DSC informed him that his pre-suit demand had been refused, and pursuant to 8 *Del. C.* § 220, the plaintiff made a written request to inspect and copy certain books and records of DSC.[4] Specifically, he requested access to information relating to the formation, investigation and report of the Special Committee and the board's decision to accept the Special Committee's recommendation. Plaintiff stated that his purpose for this demand "is to deter-

---

**2.** On May 20, 1997 DSC sent Mr. Grimes a one-page letter informing him that his demand had been refused. The whole of the letter reads as follows:

As you know, the Board of Directors of DSC Communications Corporation (the "Board") appointed a special committee of independent directors (the "Special Committee") to investigate the issues raised in your demand letter to the Board dated June 5, 1996 (the "Demand"). The Special Committee conducted an extensive investigation, including a review of relevant documents and interviews of numerous individuals with knowledge of the issues raised in the Demand.

Based upon its investigation and consideration of applicable law, the Special Committee pre-

pared a comprehensive report to the Board recommending that the Board reject the Demand. The report was presented to the Board at its meeting on April 30, 1997. After full discussion at that meeting and a meeting held on May 15, 1997, the Board decided to accept the recommendation of the special committee.

Accordingly, the Board has rejected your demand and has declined to take any of the actions requested in the demand.

**3.** DSC did notify the plaintiff that the Board had formed the Special Committee.

**4.** In August 1997, the plaintiff amended his Section 220 demand in order to correct a procedural defect.

mine the independence of the Special Committee and whether the Special Committee and the Board have complied with Delaware law in their analysis and rejection of the Demand."

By letter dated August 18, 1997, DSC responded to the Section 220 demand, producing some documents, but redacting or refusing to provide others.[5] Importantly, DSC has refused to produce the Special Committee's report or any documents accompanying it. As to the documents it resists making available for inspection and copying, DSC asserts plaintiff's lack of entitlement on several grounds, as follows: (i) the plaintiff's failure to establish that he is entitled to them under 8 *Del. C.* § 220 both because he has an improper purpose in seeking them and because the documents he seeks are beyond the scope of those justified by the stated purpose, and (ii) the documents or information reflected therein are protected by the privileges for attorney-client communications and self-critical analysis, and the work product doctrine.

### III. DISCUSSION

A. *A Proper Purpose under 8 Del. C. § 220*

 It is well established that a record stockholder of a Delaware corporation is entitled to inspect corporate books and records if (i) the form and manner requirements for making a demand are met;[6] and (ii) the inspection is for a proper purpose which is "reasonably related to such person's interest as a stockholder." 8 *Del. C.* § 220; *Security First Corp. v. U.S. Die Casting and Dev. Co.,* Del.Supr., 687 A.2d 563 (1997); *Thomas &*

*Betts Corp. v. Leviton Mfg. Co.,* Del.Supr., 681 A.2d 1026 (1996). Proper purpose has been construed to mean that a shareholder's *primary purpose* must be proper, irrespective of whether any secondary purpose is proper. *CM & M Group, Inc. v. Carroll,* Del.Supr., 453 A.2d 788, 792 (1982); *Helmsman Management Serv. v. A & S Consult.,* Del.Ch., 525 A.2d 160, 164 (1987) (emphasis added). Additionally, the primary purpose may not be adverse to the corporation's best interest. *Thomas & Betts Corp.,* Del.Ch., 685 A.2d 702, 709 (1995), *aff'd* 681 A.2d 1026 (1996). It is the stockholder's burden to establish by a preponderance of the evidence that his purpose is proper. *Id.* at 1028.

 A stockholder wishing to pursue a derivative action after a board of directors has refused a pre-suit demand must allege with particularity facts sufficient to create a reasonable doubt that the corporation's board wrongfully refused the demand. *See, e.g., Scattered Corp. v. Chicago Stock Exchange,* Del.Supr., 701 A.2d 70, 73 (1997). Plaintiff argues he is entitled to obtain access to DSC's books and records in order to determine whether there are grounds to assert a claim that his June 1996 demand was wrongfully refused, and if so, to assist him in meeting the particularized pleading requirements of Chancery Court Rule 23.1.[7]

 Recent opinions of the Supreme Court strongly suggest that the plaintiff's stated purpose is a proper one under Section 220. It is well settled law in Delaware that a plaintiff who files a derivative suit is not entitled to discovery in that action in order to assist him or her in meeting the particularized pleading requirements of Rule 23.1. In

---

5. The documents that DSC continues to withhold are as follows:

 1. Documents produced or prepared by the Special Committee including its report recommending refusal of the plaintiff's pre-suit demand.

 2. Documents referring or relating to interviews conducted by the Special Committee.

 3. Documents referring or relating to any legal authorities relied on or considered by the Special Committee.

 4. Documents referring or relating to meetings held by the Special Committee or actions taken by the Committee in lieu of a meeting, including minutes of such meetings.

 5. Documents reflecting disbursements made in connection with investigations conducted by the Special Committee.

 6. Documents reviewed or provided to the board in connection with its acceptance of the Special Committee's recommendation.

 7. Other documents referring or relating to the board's rejection of the plaintiff's pre-suit demand. [attorney-client privilege]

6. DSC does not dispute that the plaintiff has satisfied the form and manner requirements.

7. As discussed above at note 4, the books and records at issue pertain directly to the activities of the Special Committee.

reaffirming this strict rule in *Grimes*, the Supreme Court noted that derivative plaintiffs have other avenues available by which to obtain information bearing on the subject of their claims outside the civil discovery context. *Grimes*, 673 A.2d at 1216 n. 11 (quoting *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 934–35 n. 10 (1993)) (noting that surprisingly little use has been made of Section 220 as an information gathering tool in the derivative context). In the particular context of demand refusal, the Supreme Court stated:

> [a] stockholder who makes a serious demand and receives only a peremptory refusal has the right to use the 'tools at hand' to obtain the relevant corporate records, such as reports or minutes, reflecting the corporate action and related information in order to determine whether or not there is a basis to assert that demand was wrongfully refused.

*Id.* at 1218.

Similarly, in *Scattered Corp.* the Supreme Court chastised the plaintiffs for failing to take advantage of the opportunity to bring a Section 220 action *"targeted at the process and findings of the Board . . .* in acting on this demand." *Scattered Corp.*, 701 A.2d at 78 (emphasis added). Due to the plaintiff's failure to bring such an action the Supreme Court stated "plaintiffs cannot argue that they have used the available 'tools at hand' to obtain the necessary information before filing a derivative action." *Id.* at 79.

In the present action, the plaintiff has taken to heart the Supreme Court's admonition. He made a demand and, nearly one year later, was told without explanation, or "peremptorily," that the board of directors, on the recommendation of the Special Committee, had refused his demand. Plaintiff is now attempting to "use the tools at hand," in order to determine whether his demand was wrongfully refused. *Grimes* and *Scattered Corp.* clearly indicate that a Section 220 request for documents under these circumstances is proper.

DSC also argues that, assuming the propriety of Grimes' stated purpose, his actual purpose is improper. DSC points to the fact that Grimes was a large shareholder of DSC but sold all but 1,000 shares of his stock. From this DSC argues that the minimal size of the plaintiff's remaining investment as compared to his wealth, his prior holdings, and the expense of pursuing this litigation, lead to the conclusion that he is not pursuing this case in order to advance his economic interest as a shareholder. Rather, the defendant contends, the plaintiff's actions demonstrate that he is pursuing this action as part of a vendetta against DSC and Donald.[8]

I cannot accept DSC's argument. The only issue here is whether Grimes, as a stockholder of DSC and the person who made a demand on the DSC board of directors, should be given access to the record of the activities of the Special Committee in order to assess whether that committee acted independently and with due care in rejecting his demand. His persistence in pursuing his legal rights may be unusual but it is hardly cause for criticism. Indeed, Grimes was forced to bring this action only because DSC chose to reject his demand without explanation and then refused to honor his written demand for access to its books and records. Having made those choices, DSC can hardly be heard to complain that Grimes has brought this action to secure access to information to which he is entitled. Moreover, I note that the issue raised by Grimes in his earlier action was not a trivial or insubstantial one. Indeed, in his opinion dismissing the claim, Chancellor Allen referred to certain provisions of Donald's employment contract challenged by Grimes as "foolish" and "ill-conceived." At this stage of the proceedings, I am, of course, in no position to pass on the merits of any future derivative action Grimes may bring. Nevertheless, there is nothing in the record to date suggesting that Grimes' persistence in challenging Donald's compensation package is motivated by some improper animus.

8. DSC also argues that the plaintiff's real purpose in obtaining the documents is so that he can use them in a later proceeding where he and the DSC's interests will be adverse to one another. This argument would seem to ignore the fact that

Grimes' efforts are directed at the institution of derivative litigation, brought on behalf of DSC, in which, at least in theory, his interests and those of DSC are aligned.

## B. *The Scope of the Required Production*

■ DSC argues that the plaintiff has failed to prove that each requested category of documents he seeks are essential to achieving his stated purpose as required by Section 220. DSC contends that by providing the underlying documents relating to the issues considered by the Special Committee it has already produced all of the documents sufficient for the plaintiff to accomplish his purported purpose.[9] While it is true that over 2,800 pages of documents regarding Donald's compensation arrangements have been produced, the defendant's argument misconstrues the opinions of the Supreme Court in *Grimes, Rales* and *Scattered Corp.* This is so because the purpose supporting plaintiff's Section 220 demand is his right to inquire into the independence, good faith and due care of the Special Committee. The underlying merits of the issues addressed by the Special Committee are of secondary or indirect relevance.

As stated in *Grimes,* the right to obtain corporate records for the purpose of determining whether or not a demand was improperly refused focuses on the committee process itself and extends at least to "reports or minutes, reflecting the corporate action." *Grimes,* 673 A.2d at 1218. Thus, plaintiff is entitled to receive copies of the Special Committee's report,[10] minutes of the meetings of the Special Committee and minutes of any meeting of the board of directors relating to the creation or functioning of the Special Committee, including any meeting of the board of directors at which the recommendation of the Special Committee was considered or approved.

Ordinarily, these basic documents should suffice for the purposes of establishing or raising reasonable grounds for suspicions about a special committee's independence,

good faith and due care. Thus, I conclude that the plaintiff is not entitled to receive or examine copies of other documents not directly related to the Special Committee's conclusions and recommendations unless he can articulate a reasonable need to inquire further after review of those basic documents. For example, I will require a further showing of need before requiring DSC to produce to Grimes interview summaries prepared by counsel to the Special Committee. Similarly, although documents reflecting payments made to or on behalf of the members of the Special Committee should be made available to Grimes, DSC need not now provide him with records of every disbursement made in connection with the investigation.[11]

These conclusions are broadly consistent with decisions of this Court in defining the scope of allowable discovery in the analogous context of a motion by a special litigation committee to dismiss or settle properly instituted derivative litigation. *Kaplan v. Wyatt,* Del.Ch., 484 A.2d 501 (1984), *aff'd* 499 A.2d 1184 (1985) was the first case after *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981), in which the Court of Chancery was called upon to apply *Zapata* 's now familiar, two-part test to a corporation's motion to dismiss a derivative action. In *Kaplan,* then-Chancellor Allen permitted limited discovery designed to facilitate inquiries by the trial court into the independence and good faith of the committee and the reasonableness of its investigation and conclusions. *Kaplan,* 484 A.2d at 507. The Chancellor concluded that it necessarily followed that the Court is required to read the report of the committee. *Id.* at 510.

In *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del.Ch., C.A. No. 13950, Allen, C., 1997 WL 38130 (Jan. 29, 1997),

9. In making this argument, the defendant analogizes the present situation to discovery in a civil lawsuit where a party is entitled to discover documents which contain the facts relevant to the case, as opposed to providing a party with an attorney's conclusions and work product concerning those documents. From this, the defendant asserts that while it has provided the plaintiff with documents "targeted" at the Special Committee investigation, it need not provide other documents such as the committee report be-

cause the plaintiff has already received the documents used in creating the report.

10. Counsel for DSC has represented to the Court that there is a single report, prepared by counsel for the Special Committee, which is that committee's report to the board of directors.

11. Issues of privilege asserted by DSC are discussed *infra.*

Chancellor Allen again discussed the extent and scope of discovery, this time in the context of a settlement proposed by a special litigation committee over the objection of the plaintiff. Again, the Chancellor stated that discovery requests should be tailored to facilitate the determination at issue—the independence and good faith of the committee and the bases supporting its conclusions. *TLC Beatrice* at 1–2 (citing *Zapata*, 430 A.2d at 788). The Court observed that its ruling should "not hinder [plaintiff's] discovery of the pertinent information concerning the investigation conducted by the [committee] with the assistance of counsel. The [committee] *report and accompanying documents* should provide a sufficient basis for [plaintiff]. . . [to] determine whether the investigation was done in good faith and in an informed manner and whether the conclusions reached can be thought fair." *Id.* at 12 (emphasis added).

The remaining issue is whether the plaintiff is entitled to production of the documents that the defendant asserts are privileged.

### C. Attorney–Client Privilege

█ While the attorney-client privilege may be asserted by a corporation that has sought legal advice, "the privilege is not absolute and an oft-invoked exception applies in suits by minority shareholders." *Moran v. Household Int'l, Inc.*, Del.Ch., C.A. No. 7730, Walsh, V.C., 1984 WL 8259 (Sept. 18 1984) Mem. Op. at 4. Specifically, "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show "good cause" why the privilege should not apply." *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103–04 (5th Cir.1970), *cert denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971).

█ In determining whether a stockholder has shown sufficient "good cause" to preclude application of the attorney-client privilege, Delaware courts follow the approach outlined in *Garner*. *See Deutsch v. Cogan*, Del.Ch., 580 A.2d 100, 105 (1990) (stating that while not binding on this court Delaware courts have consistently followed *Garner* ); *Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 782–83 (1993) (determining whether plaintiff was entitled to production of documents prepared in anticipation of litigation by analyzing "good cause" factors set forth in *Garner* ). In *Garner*, the court enumerated several factors for determining whether good cause exists. Of particular relevance in the present case are the following: (i) the number of shares owned by the shareholder and the percentage of stock they represent; (ii) the assertion of a colorable claim; (iii) the necessity of the information and its unavailability from other sources; (iv) whether the stockholder has identified the information sought and is not merely fishing for information; and (v) whether the communication is advice concerning the litigation itself. *See Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, Del.Ch., C.A. No. 8853, Jacobs, V.C., 1987 WL 12500 (June 19, 1987) (noting three factors of paramount importance to consider when determining whether the requisite good cause is present to preclude invocation of the privilege: (i) whether claim is colorable; (ii) necessity or desirability of information and its availability from other sources; and (iii) extent to which information sought is identified as opposed to blind fishing expedition).

At the outset I note the different posture of this action from those in which courts normally analyze whether to invoke the exception to application of the attorney-client privilege. Usually, the *Garner* test is applied in the context of a pending lawsuit, for instance where a shareholder has already filed a derivative action. In the present action, the plaintiff seeks access to DSC's books and records in order to determine whether the board wrongfully refused his demand, and if so to assist him in meeting the particularized pleading requirements of Rule 23.1. Plaintiff is looking down the road to a demand-refused case where the focus will be on whether or not he can establish sufficient facts to overcome the decision made by the Special Committee and the board of directors in rejecting his demand. Thus, while as of yet no action has been filed, the current posture of the case contemplates

the possible filing of a derivative suit sometime in the future. Thus, it is appropriate to analyze whether the plaintiff has demonstrated "good cause" under the factors set forth in *Garner*.

■ Plaintiff contends that his need for the information and its unavailability from other sources weigh heavily in favor of disclosing the otherwise privileged information. Further, because the information sought in this Section 220 demand is necessary to the plaintiff's dispute with DSC, but is unavailable from other sources, he argues for production of the requested documents. As to the colorable claim element, the plaintiff argues that the Supreme Court's pronouncements in *Scattered Corp.* and *Grimes* demonstrate that he has asserted a colorable claim. As to the scope of the request, the plaintiff contends that far from being a "fishing expedition," his demand is specifically tailored to obtain information regarding the "process and findings" of the special committee and the DSC board in responding to Mr. Grimes' pre-suit demand regarding the Donald compensation package. Plaintiff further argues that it is extremely unlikely that the documents contain counsel's strategies or tactics regarding the case.

Defendant contends that the report prepared by the special committee reflects extensive private communications between members of the committee and its counsel. The report contains, defendant contends, legal analysis, advice and recommendations regarding the appropriate response to Mr. Grimes' demand. As such, defendant argues they are no different than any other private correspondence between a client and its attorney. Further, applying the *Garner* test, the defendant argues the factors weigh in favor of preserving DSC's attorney-client privilege. In support of its position, the defendant points, *inter alia*, to the following:

(i) the small number of shares plaintiff owns; [12] (ii) whether the claim is meritorious in light of the Delaware Supreme Court's affirmance of the dismissal of the claim pleaded under a different theory; (iii) the necessity of producing the report in light of the fact that the documents providing the basis for the committee's conclusions have already been produced; and (iv) that the report specifically relates to advice and recommendations from attorneys regarding the necessity and propriety of litigation.

Giving due weight to the factors set forth in *Garner*, and in particular the ones listed above, I am satisfied that the plaintiff has demonstrated "good cause" for production of the privileged documents. Of particular import is the fact that the documents sought are unavailable from any other source while at the same time their production is integral to the plaintiff's ability to assess whether the board wrongfully refused his demand—the stated purpose of his Section 220 demand.

In *Grimes*, the Supreme Court specifically stated that a stockholder who makes a demand and receives only a peremptory refusal has "the right" to use the "tools at hand" to obtain relevant corporate records for the purpose of determining whether the demand was wrongfully refused. The Supreme Court specifically identified, without limitation, reports, minutes and other related information reflecting the corporate action taken as documents which a shareholder was entitled to receive. Further, in making these statements, the Supreme Court contemplated that these documents would be available to a shareholder in the context of a Section 220 demand.

### D. *Work Product*

■ The work product doctrine is intended to protect "materials an attorney assembled and brought into being in anticipation of

---

12. Defendant cites two Delaware cases which mention the plaintiff's ownership as one factor to be considered in determining whether good cause exists. *See, e.g. Tabas v. Bowden*, Del.Ch., C.A. No. 6619, Hartnett, V.C., 1982 WL 17820 (Feb. 16, 1982); *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, Del.Ch., C.A. No. 13950, Allen, C., 1996 WL 132983 (March 15, 1996). From this Defendant argues that the plaintiff should be denied access to the requested documents based on his small stock ownership. These cases, however, attach no more importance to this factor than any of the others. While I will give it due weight, in the end my determination will take into account all of the relevant factors and will be based on a balancing of their importance in the present situation.

litigation." *Lee v. Engle*, Del.Ch., C.A. No. 13323, 13284, Steele, V.C., 1995 WL 761222 (Dec. 15, 1995) Mem. Op. at 10 (citing *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir.1982) *cert. denied* 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984)). Pursuant to Chancery Court Rule 26(b)(3) a party may obtain information otherwise protected by this doctrine upon a showing that it has substantial need for the materials and is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Thus, the question at issue is whether the plaintiff has demonstrated a "substantial need" for the information which the defendant asserts is protected by the work product doctrine.

■■■ For the same reasons that the plaintiff has shown "good cause" to overcome the claim of attorney-client privilege, I conclude he has also shown a substantial need for the information for purposes of the work product doctrine. As discussed *supra*, in order for the plaintiff to be able to determine whether the committee and the board wrongfully refused his demand he needs to have access to documents which reveal the deliberative processes which the committee and the board underwent. The only place the plaintiff can obtain this information is in such documents as the report of the special committee and the minutes of the meetings of the board at which it discussed the committee's report and voted to accept its recommendation. Accordingly, under the circumstances, just as the defendant's attorney-client privilege claim fails, so too must its work product immunity claim.

### E. *Self-Critical Analysis*

■■■ Finally, the defendant seeks to prevent production of the requested documents on the basis that they are protected under the self-critical analysis privilege. In places where recognized, the privilege protects confidential, non-factual deliberative material, including recommendations or opinions resulting from internal investigations, reviews or audits. *See, e.g., Wylie v. Mills*, 195 N.J.Super. 332, 478 A.2d 1273, 1276 (1984).

In situations where the self-critical analysis privilege has been asserted, Delaware courts have thus far refused to recognize the privilege. In analyzing whether to apply the self-critical analysis privilege to the present circumstances, therefore, the underlying premise from which I work is that there exists no basis upon which the defendant may argue for application of the privilege.

Only two Delaware cases have analyzed a claim asserting the self-critical analysis privilege. The first case analyzing the privilege was *Register v. Wilmington Medical Center, Inc.*, Del.Supr., 377 A.2d 8 (1977). In *Register*, a medical malpractice case, the Delaware Supreme Court held that the trial court had committed reversible error by refusing to admit evaluation reports containing opinions of hospital physicians concerning the professional competence of another physician. The Court rejected arguments that such evaluations were confidential and that disclosure would chill the evaluative process because there was no principle of Delaware law that would make the report privileged or subject to non-disclosure. The Delaware General Assembly thereafter created a statutory privilege for medical peer review reports, but did not extend that privilege outside that context.

The only other Delaware case to analyze a claim of self-critical analysis privilege was *Artesian Water Company v. New Castle County*, Del.Ch., C.A. No. 5106, Marvel, C., 1981 WL 15606 (April 9, 1981). In *Artesian*, the Court of Chancery refused to apply the privilege relying in part upon the Supreme Court's holding in *Register* that such a privilege had never been recognized in Delaware. Thus, there is no precedent in Delaware for accepting the defendant's argument.

■■■ Those courts that recognize the self-critical analysis privilege apply a four factor test in determining whether the privilege applies. The court looks to whether: (i) the information in question results from a self-critical analysis; (ii) the information was intended to be and has been kept confidential; (iii) the public has a strong interest in preserving the free flow of the type of information sought; and (iv) the free flow of that information would be curtailed if the information were discoverable. *See Dowling v.*

*American Hawaii Cruises, Inc.,* 971 F.2d 423, 425–26 (9th Cir.1992).

 Focusing primarily on the fourth factor, I conclude that even if Delaware were to adopt this privilege, it could not properly be asserted in the present situation. Defendant argues that rejection of the privilege will have a chilling effect on the special committee process of corporations residing in Delaware. Defendant further argues that if committee reports are not privileged, the integrity of the process itself is likely to be compromised because corporations will no longer be honest in their self-evaluations and thus will have an adverse impact on shareholders. Further, in the shareholder demand context, absent assurances that its determinations and recommendations will be kept confidential, boards and special committees would no longer have any incentive to perform an objective and candid analysis of the issues raised by the demand.

I reject the defendant's argument that such a result will occur if Delaware courts refuse to adopt the self-critical analysis privilege. In a shareholder demand situation, far from discouraging candor and objectivity, subjecting the report to disclosure should encourage the committee and the board to undergo a thorough investigation. A thorough report may convince a shareholder not to file a derivative suit or, if one is filed, provide strong evidence that the committee and the board undertook a comprehensive investigation which fully supported its determination to refuse the demand.

\* \* \*

Because the privilege issues in this matter have been litigated in general terms and not with reference to particular parts of the Special Committee's report or other documents, which may contain or reflect confidential communications or advice deserving protection for reasons other than those already addressed in this opinion, I will allow DSC to redact from the documents to be produced any such passages which it believes, in good faith, may be subject to a successful assertion of privilege for such a reason. Should DSC choose to follow this procedure, it should promptly move for an order confirming its actions.

## IV. CONCLUSION

For the reasons stated, and the terms discussed, judgment will be entered for the plaintiff and against the defendant. The plaintiff is directed to submit a form of order, on notice.