## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RICHARD L. SALBERG, M.D. and    :
DAVID PINKOSKI,    :
   :
         Plaintiffs,    :
   :
        v.    :     **C.A. No. 2017-0018-JRS**
   :
GENWORTH FINANCIAL, INC.,    :
   :
         Defendant.    :

## MEMORANDUM OPINION

Date Submitted: May 1, 2017
Date Decided: July 27, 2017

Jessica Zeldin, Esquire and P. Bradford deLeeuw, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Judith S. Scolnick, Esquire, Thomas L. Laughlin IV, Esquire and Donald A. Broggi, Esquire of Scott+Scott, Attorneys At Law, LLP, New York, New York; David R. Scott, Esquire of Scott+Scott, Attorneys at Law, LLP, Colchester, Connecticut; Robert C. Schubert, Esquire, Willem F. Jonckheer, Esquire and Dustin L Schubert Esquire of Schubert Jonckheer & Kolbe LLP, San Francisco, California; Robert B. Weiser, Esquire, Brett D. Stecker, Esquire and James M. Ficaro, Esquire of The Weiser Law Firm P.C., Berwyn, Pennsylvania; Michael I. Fistel, Jr., Esquire of Johnson & Weaver, LLP, Marietta, Georgia; and Corey D. Holzer, Esquire of Holzer & Holzer, LLC, Atlanta, Georgia, Attorneys for Plaintiffs.

Daniel A. Dreisbach, Esquire, Srinivas M. Raju, Esquire and Sarah A. Clark, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, and Greg A Danilow, Esquire, Caroline Hickey Zalka, Esquire and Evert J. Christensen, Esquire of Weil, Gotshal & Manges LLP, New York, New York, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

Plaintiffs, Richard L. Salberg, M.D. and David Pinkoski, filed a Verified Complaint Pursuant to 8 *Del C.* § 220 (the "Complaint") to compel Defendant, Genworth Financial, Inc. ("Genworth" or the "Company"), to produce unredacted copies of documents that Genworth claims are subject to the attorney-client privilege. These same Plaintiffs, represented by the same counsel, previously filed derivative claims in this Court alleging breaches of fiduciary duties by Genworth's board of directors and several of its officers (the "Derivative Action"). The derivative claims are still pending.[1]

On October 23, 2016, after the Derivative Action was filed, Genworth announced that it had agreed to be acquired by China Oceanwide Holdings Group, Co., Ltd. ("China Oceanwide") (the "Merger"). Shortly after the announcement of the Merger, Plaintiffs made a demand on the Company to produce documents they believed would reflect whether Genworth's board of directors considered the value of the derivative claims in negotiating the merger consideration with China Oceanwide. Genworth responded to the demand and produced hundreds of pages of responsive documents. Many of these documents, however, were heavily redacted

---

[1] The parties have agreed that the Court's decision on a motion to dismiss the Derivative Action, *sub judice*, should be delayed based on the expectation that the Merger, if it passes regulatory approvals, would close sometime this summer or early fall. *See Genworth Fin., Inc. Consol. Deriv. Litig.*, C.A. No. 11901-VCS, Letter to the Honorable Joseph R. Slights III from Srinivas M. Raju, dated May 5, 2017 (Trans. ID 60560783).

in keeping with Genworth's assertion that their contents were protected by the attorney-client privilege.

Plaintiffs do not dispute that the Company likely has produced all documents responsive to their demand. The difficulty, of course, is that the documents are of little value to Plaintiffs given their heavily redacted state. To address this impasse, Plaintiffs invoke the well-known *Garner* fiduciary exception to the attorney-client privilege to argue that Genworth must produce unredacted documents.[2] The dispute between the parties, therefore, raises only the narrow legal issue of whether the *Garner* exception applies in these circumstances.

This is my decision after "trial" on a stipulated paper record. For the reasons that follow, I conclude that *Garner* does not aid the Plaintiffs in this instance to overcome Genworth's invocation of the attorney-client privilege. I agree with Plaintiff that most of the factors identified by *Garner* as relevant when assessing whether a fiduciary exception to the privilege should apply favor their position here. Even so, these factors are neither all-inclusive nor dispositive in every case. The attorney-client privilege does not lend itself to mechanistic analysis; the court's

---

[2] *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), *cert denied*, 401 U.S. 974 (1971). Just as "*Daubert*" is now well-known to trial lawyers by that single name to personify the court's mandated gatekeeping function with respect to expert evidence, *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), *"Garner"* is nearly as well-known to corporate litigators to embody the rule that, in certain instances, the attorney-client privilege will be unavailable to corporate fiduciaries who are defending claims brought against them by those to whom the fiduciary duty is owed.

assessment and enforcement of the privilege must take into account the relevant and unique circumstances of each case. Given that Plaintiff's demand for books and records seeks information directly related to separate claims they are actively litigating against the parties who have invoked the privilege, I am satisfied that they have failed to show good cause, at least for now, to overcome the privilege.

## I.    BACKGROUND

The limited issue joined for decision in this action has enabled the parties to stipulate to most of the relevant facts. These are my findings based on the stipulated paper record submitted as evidence at trial.[3]

### A. Parties

Plaintiffs, Richard L. Salberg, M.D. and David Pinkoski, hold and have continuously held shares of Genworth common stock since October 2008 and April 2009, respectively. Defendant, Genworth, is a Delaware corporation with its principal executive offices in Richmond, Virginia. The Company offers a variety of financial services but specializes in writing several lines of insurance, including life, long-term care and mortgage insurance. The Company's common stock trades on the New York Stock Exchange under the symbol "GNW."

---

[3] *See Ruggles v. Riggs*, 477 A.2d 697, 705–06 (Del. 1984) ("[I]t has long been a principles of law in this State that . . . a judge may take judicial notice of the record and pleadings in the case before him . . .").

## B. The Derivative Action

Almost a year before making their Section 220 demand, the Plaintiffs in this action, represented by the same counsel, filed a Verified Stockholder Derivative Complaint in this Court on January 13, 2016. The complaint contained two counts for breach of fiduciary duty against the Genworth board of directors and several of its officers relating to alleged false and misleading statements made about the Company's Long-Term Care insurance business and related insurance reserves as well as its Australian mortgage insurance business. After amending their complaint twice, the operative complaint became the Verified Second Amended Stockholder Derivative Complaint filed on August 17, 2016.

Defendants filed a motion to dismiss on September 16, 2016. Briefing on the motion was scheduled to be completed on December 2, 2016. A little more than three weeks before that date, Plaintiffs filed a motion to stay. Their basis for seeking a stay was that the Company had announced just a few weeks earlier that it would be acquired by China Oceanwide in an all-cash transaction. The concern was that Plaintiffs' standing to pursue the Derivative Action would be extinguished by the Merger prior to the adjudication of the motion to dismiss. Defendants opposed the requested stay and urged the Court to take up their motion to dismiss. Ultimately, I denied the motion to stay both because the serious allegations against the Genworth officers and directors had been looming for quite some time and because the parties

4

had already substantially completed briefing on the motion to dismiss. After an amendment to the case scheduling order, oral argument on the motion to dismiss was held on February 20, 2017.

## C. The Section 220 Action

Shortly after the announcement of the Merger in October 2016, and while the parties were briefing the motion to dismiss the Derivative Action, Plaintiffs made a Section 220 demand on Genworth by letter dated November 2, 2016. Plaintiffs sought books and records that would allow them to investigate the manner in which the Genworth board of directors valued the claims asserted in the Derivative Action in connection with the Merger. In response, the Company did not contest that Plaintiffs had satisfied the form and manner requirements of Section 220 and had stated a proper purpose. The Company did object to the scope of the demand but agreed to produce the minutes of certain meetings where the Genworth board discussed the value of the derivative claims in the context of the Merger.

The parties engaged in several meet-and-confer sessions in November 2016 during which the Company agreed to produce additional board and subcommittee meeting minutes as well as all materials presented to the board concerning the value of the claims asserted in the Derivative Action. In total, Genworth produced approximately 700 pages of documents to Plaintiffs. These documents, however, were heavily redacted based on assertions of attorney-client privilege. After

5

discussions between counsel regarding the redactions were not productive, the Company maintained its assertion of privilege and provided Plaintiffs with a privilege log on January 11, 2017.

### D. Procedural History

Plaintiffs filed their Section 220 Complaint on January 12, 2017, seeking an order compelling Genworth to permit Plaintiffs to inspect unredacted copies of the books and records, or portions thereof, withheld on privilege grounds. The parties' pretrial briefs presented a single issue for decision: whether the *Garner* fiduciary exception should preclude Genworth from redacting documents for privilege. The trial was held on May 1, 2017.

## II.     ANALYSIS

### A. The Attorney-Client Privilege and the *Garner* Fiduciary Exception

It is well settled in our law that the attorney-client privilege is "critical to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration

of justice . . ."[4]  This rationale holds true in cases where the client is a corporation.[5]

The attorney-client privilege, rooted in common law principles, is now codified in

Delaware Rule of Evidence 502(b), which provides:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.[6]

While our law embraces the attorney-client privilege and recognizes its

importance to the proper administration of justice, it cannot be forgotten that the

privilege represents "an exception to the usual rules requiring full disclosure and

[that] its scope can be limited where circumstances so justify."[7]  To be sure, "the

---

[4] *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW* ("*Wal-Mart II*"), 95 A.3d 1264, 1278 (Del. 2014) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)) (internal quotation marks omitted).  *See also Riggs Nat. Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 713 (Del. Ch. 1976) ("Thus, the purpose of the attorney-client privilege is to foster the confidence of the client and enable him to communicate without fear in order to seek legal advice.  This is indeed important.") (citing *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 367 (D. Del. 1975)).

[5] *Id.*

[6] D.R.E. 502(b).

[7] *Riggs*, 355 A.2d at 713 (internal citation omitted).

privilege is not absolute."[8]  Indeed, this reality is explicitly recognized in DRE 502 itself.[9]

In addition to the codified exceptions to the attorney-client privilege, Delaware recognizes "an oft-invoked exception [that] applies in suits by minority shareholders."[10]  This exception—the celebrated "*Garner* fiduciary exception"— recognizes that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show 'good cause' why the privilege should not apply."[11]  Our Supreme Court has adopted the *Garner* fiduciary exception in both plenary actions and Section 220 actions.[12]

In keeping with the important policy rationales that justify the attorney-client privilege, "the *Garner* fiduciary exception to the attorney-client privilege is narrow,

---

[8] *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 568 (Del. Ch. 1998) (internal quotation marks and citation omitted).

[9] D.R.E. 502(d) (listing exceptions to the rule of privilege).

[10] *Grimes*, 724 A.2d at 568 (internal quotation marks and citation omitted).

[11] *Id.* (citing *Garner*, 430 F.2d at 1103–04).

[12] *Wal-Mart II*, 95 A.3d at 1278.

exacting, and intended to be very difficult to satisfy."[13]  The plaintiff stockholder

must carry a burden of showing "good cause" to overcome the privilege.[14]

Genworth's sole basis for refusing to produce unredacted copies of the books

and records Plaintiffs seek here is that Plaintiffs have failed to show "good cause"

to overcome the otherwise properly invoked attorney-client privilege.  Plaintiffs, of

course, disagree.  In resolving this dispute, I have remained mindful of our Supreme

Court's admonition that the goal of the "good cause" inquiry is to achieve "a proper

balance between legitimate competing interests."[15]

## B. The Good Cause Factors

*Garner* sets forth an illustrative, though not exhaustive, list of factors a court

may consider when determining whether good cause exists to invoke the fiduciary

exception.  *Garner* lists the following factors:

> (1) the number of shareholders and the percentage of stock they
> represent; (2) the bona fides of the shareholders; (3) the nature of the
> shareholders' claim and whether it is obviously colorable; (4) the
> apparent necessity or desirability of the shareholders having the
> information and the availability of it from other sources; (5) whether, if
> the shareholders' claim is of wrongful action by the corporation, it is of
> action criminal, or illegal but not criminal, or of doubtful legality;
> (6) whether the communication related to past or to prospective actions;
> (7) whether the communication is of advice concerning the litigation
> itself; (8) the extent to which the communication is identified versus the

---

[13] *Id.*

[14] *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *10 (Del. Ch. Apr. 30, 2015).

[15] *Wal-Mart II*, 95 A.3d at 1278.

extent to which the shareholders are blindly fishing; (9) the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.[16]

The court's purpose in considering these factors is to conduct a "balancing test . . . to determine whether the balance tips in favor of disclosure or non-disclosure."[17] While any or all of these factors, among others, may be relevant in the court's analysis, Delaware courts have identified three as having "particular significance."[18] They are: "(1) the colorability of the claim; (2) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and (3) the apparent necessity or desirability of shareholders having the information and availability of it from other sources."[19] In addition to these three

---

[16] *Garner*, 430 F.2d at 1104. Despite the relatively recent express adoption of the *Garner* framework by our Supreme Court for both plenary and Section 220 actions, Delaware courts have a long history of utilizing the framework as a "workable and logical" approach to analyzing claims of attorney-client privilege in the context of stockholder litigation. *See Lee v. Engle*, 1995 WL 761222 (Del. Ch. Dec. 15, 1995) ("Although not a binding case, this Court adopted and consistently has followed *Garner v. Wolfinbarger. . .*"); *Zirn v. VLI Corp.*, 621 A.2d 773, 782–83 (Del. 1993) (determining whether plaintiff was entitled to production of documents prepared in anticipation of litigation by analyzing "good cause" factors set forth in *Garner*); *Deutsch v. Cogan*, 580 A.2d 100, 105 (Del. Ch. 1990) (stating that while not binding on this court, Delaware courts have consistently followed *Garner*); *Sealy Mattress Co. of New Jersey, Inc. v. Sealy Inc.*, 1987 WL 12500 (Del. Ch. June 19, 1987) (following the *Garner* framework for determining whether plaintiffs have shown "good cause" that the attorney-client privilege should not apply).

[17] *In re Fuqua Indus., Inc.*, 2002 WL 991666, at *4 (Del. Ch. May 2, 2002) (quoting *Deutsch*, 580 A.2d at 105).

[18] *Id.*

[19] *Id.* (citing *Sealy*, 1987 WL 12500, at *3); *de Vries v. Diamante Del Mar, L.L.C.*, 2015 WL 3534073, at *7 (Del. Ch. June 3, 2015) (Master's Report), *adopted*, 2015 WL 3902623 (Del. Ch. June 18, 2015).

factors, the parties have focused heavily on *Garner*'s seventh factor: "whether the communication is of advice concerning the litigation itself."

**C. Plaintiffs have Failed to Show "Good Cause" under *Garner***

Genworth takes issue with Plaintiffs on only two of the relevant factors. For instance, Genworth does not dispute that Plaintiffs have precisely identified the documents at issue and thus are not blindly fishing. Likewise, Genworth does not contend that Plaintiffs have other sources from which they can obtain the information they seek. Instead, Genworth pushes back on the colorability of the Plaintiffs' claim as well as whether the privileged communications reflect "advice concerning the litigation itself." I address these arguments in turn.

**1. Plaintiffs Have Stated a Colorable Claim**

Genworth argues that Plaintiffs have failed to allege an "obviously colorable" claim for breach of fiduciary duty relating to the board's analysis of the derivative claims when considering the Merger. In this regard, Genworth notes that under *Corwin v. KKR Financial Holdings LLC*,[20] the fully informed and uncoerced vote of stockholders would "cleanse" all price and process claims arising from the Merger. Genworth then contends that even if the vote did not cleanse the price and process claims, Plaintiffs have not alleged sufficient facts to support a finding that the directors breached their fiduciary duties. Plaintiffs counter by invoking the proper

---

[20] 125 A.3d 304 (Del. 2015).

11

purpose standard under Section 220 and argue that they have "clearly stated a credible basis from which the Court may infer possible mismanagement or wrongdoing."[21]

In the context of this Section 220 action, I agree with Plaintiffs that the "colorability" of their claim must be assessed under the standard that applies here— "credible basis"—a standard that has notoriously been described as "the lowest possible burden of proof."[22] Plaintiffs have alleged in the Derivative Action that Genworth's fiduciaries failed to oversee, detect and prevent fraudulent conduct in two of Genworth's business lines. The Company maintains that its board ascribed no value to those claims when negotiating for merger consideration. Plaintiffs have challenged that position and, *inter alia*, point to the serious allegations of systemic fraud that have been levelled against the Company in connection with its long-term care insurance and Australian mortgage insurance lines. Given the serious nature of the underlying conduct, and the significant harm that Plaintiffs allege to have been

---

[21] Pls.' Opening Pre-Trial Br. 11. *See de Vries*, 2015 WL 3534073, at *7 (holding that when a stockholder asserts corporate wrongdoing as its proper purpose for demanding books and records the stockholder need only state a 'credible basis' from which the Court may infer possible mismanagement and wrongdoing."); *see also*, *Lululemon*, 2015 WL 1957196, at *11 (same).

[22] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006) ("[T]he 'credible basis' standard sets the lowest possible burden of proof. The only way to reduce the burden of proof further would be to eliminate any requirement that a stockholder show *some evidence* of possible wrongdoing.") (emphasis in original).

caused by the failure of oversight with respect to this conduct, Plaintiffs question the Company's assertion that its board deemed the derivative claim to be worthless.

To be clear, the strength of Plaintiffs' claims in the Derivative Action as measured against Chancery Rule 12(b)(6) or Rule 23.1 standards is not at issue here. The question is whether Plaintiffs have articulated a credible basis from which the Court may infer possible mismanagement or wrongdoing in connection with the Genworth board's evaluation of the derivative claims during the negotiation of the Merger. I am satisfied that they have. Accordingly, in the context of this Section 220 action, Plaintiffs have also demonstrated a colorable claim under *Garner*.[23]

## 2. The Communications Contain Advice Regarding the Derivative Action

Genworth next argues that the communications that have been redacted from the produced documents reflect advice concerning the litigation itself. Plaintiffs' initial response is that this *Garner* factor does not fit here because the advice the board received related to the Derivative Action, not the direct breach of fiduciary duty action they are contemplating with respect to the Merger. Genworth does not directly address this argument but instead focuses on the impropriety of derivative

---

[23] I note that Genworth did not initially object to producing documents to Plaintiffs on the ground that Plaintiffs had not stated a proper purpose or a credible basis to infer wrongdoing or mismanagement. That argument came later in response to the filing of this Section 220 action.

plaintiffs securing information through a Section 220 action that they inarguably could not secure through discovery in the underlying derivative litigation.

At first glance, it is difficult to quarrel with Plaintiffs' reading of *Garner*'s seventh factor. The litigation to which the privileged communications directly relate is not this litigation or the litigation Plaintiffs are thinking of bringing. But the *Garner* factors are not "talismanic."[24] In every case, the court must make "a particular judgment . . . in light of the general role played by the lawyer-client privilege, and all of the specifics of the case, whether production of withheld materials is warranted."[25] Here, these same Plaintiffs are the plaintiffs in the Derivative Action. They are represented in both actions by the same counsel. They have initiated this action to gain access to privileged documents that they undeniably would not have access to through discovery in the Derivative Action.[26] While I take Plaintiffs at their word that they seek the documents to investigate potential direct claims relating to the Merger, the fact remains that the documents undoubtedly will contain the mental impressions and assessments of the defendants and defense counsel in the Derivative Action regarding the strengths and weaknesses of the

---

[24] *Cole v. Wilmington Materials, Inc.*, 1993 WL 257415, at * 2 (Del. Ch. July 1, 1993).

[25] *Id. See also Tabas v. Bowden*, 1982 WL 17820, at *2 (Del. Ch. Feb. 16, 1982) ("[e]ach case involving the attorney-client privilege turns on its own facts . . .").

[26] *Cf. Khanna v. Covad Comm'cns Gp., Inc.*, 2004 WL 187274, at *9 (Del. Ch. Jan. 23, 2004) ("A Section 220 action is not a substitute for discovery under the rules of civil procedure.").

derivative claims. The Company's board is understandably concerned that the production of these most sensitive documents will give Plaintiffs an unfair advantage in the Derivative Action. One can hardly blame them.

Plaintiffs attempt to allay this concern by noting that all constituencies expect the Merger to close during the summer or early fall of this year and, when it does close, Plaintiffs' derivative standing will be extinguished. Genworth, in response, poses the question: why not wait to see if the Merger closes before determining whether privileged books and records that reflect a party's analyses of pending claims should be produced to the adverse party? Plaintiffs' best argument against waiting is that Genworth is in the midst of negotiating a settlement of related securities claims brought in the Eastern District of Virginia and that the release of those claims could prejudice their rights to proceed here on a direct claim relating to the Merger. They also contend that they might need access to the privileged information in order to oppose any proposed settlement. During closing arguments, Genworth's counsel, also counsel to the Company in the Virginia securities action, was quick with the riposte that any releases sought in the securities action "are going to relate to Section 14 (a), and 14 (a) alone."[27] Counsel continued, "[w]e do not

---

[27] Trial Tr. 29.

believe the Court could grant anything more because the claims didn't have anything more, and we're not going to ask for anything more."[28]

I noted at argument that Genworth's counsel's representations regarding the scope of the settlement in the securities case reflected "an important concession."[29] With that concession, I am satisfied that Plaintiffs do not require access to the Company's privileged attorney-client communications regarding the strengths and weaknesses of Plaintiffs' derivative claims in order to protect themselves or other stockholders in connection with the settlement of the federal securities action. There is simply no reason, then, not to wait to see what happens with the Merger. If the transaction closes, and the Derivative Action goes away, then there will be ample time for Plaintiffs to discover whether the Genworth board adequately considered the value of the derivative claims when negotiating merger consideration should they choose to bring direct claims relating to the Merger. If, for some reason, the Merger does not close, then there will be no basis under Section 220 or otherwise to compel the defendants in the Derivative Action to produce to their adversary the privileged communications they engaged in with their attorneys regarding the *bona fides* of the claims they are defending.

---

[28] Trial Tr. 29–30.

[29] Trial Tr. 30.

16

### III. CONCLUSION

The unique circumstances of this case do not warrant unredacted production of privileged communications under the *Garner* fiduciary exception. Plaintiffs cannot achieve via Section 220 what they could not achieve via discovery in the Derivative Action. Striking a "balance between [the parties'] legitimate competing interests" in this instance requires that Plaintiffs' Section 220 demand be rejected.[30] Judgment will be entered for Defendants. The parties shall cooperate to submit a final order and judgment in conformity with this Memorandum Opinion within ten (10) days.

---

[30] *Wal-Mart II*, 95 A.3d at 1278.