**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report: July 30, 2019
Date Submitted: June 11, 2019

Daniel A. O'Brien, Esquire
Jamie L. Edmonson, Esquire
Venable, LLP
1201 North Market Street, Suite 1400
Wilmington, DE 19801

Kenneth J. Nachbar, Esquire
Morris Nichols Arsht & Tunnell, LLP
1201 North Market Street
PO Box 1347
Wilmington, DE 19899

RE: *Senetas Corporation, Ltd. v. DeepRadiology Corporation*
C.A. No. 2019-0170-PWG

Dear Counsel:

This case involves a demand to inspect the books and records of a closely

held company that develops artificial intelligence systems for medical visual

recognition tasks, specifically diagnostic radiology tasks. The plaintiff, a major

investor in the company, seeks to inspect the company's books and records in

order to investigate potential corporate mismanagement and wrongdoing. The

defendant alleges the plaintiff is not entitled to inspection because it has not shown

a credible basis to infer wrongdoing or mismanagement, is a competitor with an ulterior motive for the inspection, and the scope of the demand is overbroad.

I conclude the plaintiff has established a credible basis from which a court can infer that mismanagement or wrongdoing may have occurred, and the defendant has not shown that the plaintiff has an ulterior motive negating its proper purpose. I condition inspection on the parties entering into a confidentiality agreement. With regard to the scope of the inspection, the parties shall confer and submit to the Court their considerations on specific documents or categories of books and records that are necessary, sufficient and essential for the plaintiff's proper purpose, prior to the Court making further determinations. This is a final report.

## I.  Background

### A. Factual Background[1]

Plaintiff Senetas Corporation Limited ("Senetas") is a publicly listed Australian network encryption company.[2] Senetas' non-executive chairperson is Francis W. Galbally.[3]  Defendant DeepRadiology ("DR") is a Delaware corporation involved in developing artificial intelligence systems for medical

---

[1] I refer to deposition transcripts as "Dep. Tr.," the trial transcript as "Trial Tr.," and the parties' joint exhibits submitted at trial as "JX."

[2] Galbally Dep. Tr. 12:12-13; 13:21-24.

[3] Docket Item ("D.I.") 46, at 1.

visual recognition tasks.[4] Kim Nguyen and Robert Lufkin founded DR on July 8, 2015.[5] Nguyen is DR's President, Secretary and Treasurer.[6]

In May of 2017, Senetas invested approximately $1 million of seed capital in exchange for 397,219 shares of DR's Series Seed-1 Preferred Stock, becoming a major investor/shareholder.[7] Senetas invested in DR because DR "had a leading medical application for artificial intelligence and machine learning, and had assembled a team of the most expert people around the world that were assisting in developing the application."[8] Senetas understood that, at the time it invested, the first iteration of DR's technology was awaiting FDA approval, and that approval was a key factor in Senetas' decision to invest in DR.[9] Senetas also expected that DR would pursue additional rounds of capital investment, thereby positioning DR as an acquisition target for other companies in the industry.[10]

---

[4] D.I. 9, at 2.

[5] *Id.*; Nguyen Dep. Tr. 7:12-14.

[6] Nguyen Dep. Tr. 7:18-23.

[7] D.I. 46, at 4-5.

[8] Galbally Dep. Tr. 18:6-14. Senetas believed DR's "technology will revolutionise [sic] the medical radiology industry by significantly reducing the error rate, cost and time to interpret medical images." JX 175.

[9] Galbally Dep. Tr. 56:20-22; 58:2-10 ("FDA approval to me was one of the most important aspects as to why I invested, and the fact that it was likely to be approved at some stage during 2017"); 98:7-9.

[10] Galbally Dep. Tr. 20:11-24.

Galbally was appointed to DR's Board of Directors ("Board") as Senetas' designee, and served on the Board with Nguyen, Lufkin, and Robert Rankin, the designee of another investor.[11] The evidence shows that the Board held a meeting in August of 2017 during which no minutes were taken.[12] No further board meetings were held during Galbally's tenure on the board.[13]

In January of 2018, in an attempt to obtain additional funding and without Board knowledge or approval, DR completed the preliminary steps of an Initial Coin Offering ("ICO").[14] Galbally attempted to schedule a special meeting of the Board to discuss the ICO as well as the company's overall financial needs and financing options.[15] This special Board meeting was held on February 23, 2018 with Galbally as the only member in attendance.[16] DR subsequently pulled the ICO offering from its website and never finalized the offering.[17] In a letter dated

---

[11] Galbally Dep. Tr. 335:11-15. The Amended and Restated Investors' Rights Agreement provides that Board composition will be five persons, with one vacant seat on the Board at the time the Agreement was executed. JX 30, ¶2.3.

[12] Galbally Dep. Tr. 336:2-4; 337:2-6.

[13] Galbally Dep. Tr. 335:22-336:1; 337:7-22.

[14] Nguyen Dep. Tr. 162:7-16.

[15] Galbally Dep. Tr. 348:17-22. Galbally testified that he had "grave concerns" about the ICO offering. Galbally Dep. Tr. 156:21-23.

[16] Galbally Dep. Tr. 319:24-320:7; 320:20-23; 349:8-17; JX 89.

[17] *See* JX 88.

February 26, 2018, Galbally resigned from the Board and, shortly thereafter, unsuccessfully attempted to inspect DR's books and records at DR's offices.[18]

The evidence shows that DR depleted all of its seed capital by February of 2018.[19] Since that time Nguyen and Lufkin have been funding the Company personally.[20]

In August of 2018, Senetas wrote the DR investment off its books.[21] In September of 2018, Nguyen told Galbally and other investors that DR was going to stop seeking FDA approval and would deploy its technology in a manner that would not require FDA approval.[22] At that same meeting, she also promised access to DR's books and records.[23] Later in September, Jack Dwyer ("Dwyer"), a representative of another investor, inspected DR's books and records covering operations from December of 2016 through February of 2018, and requested additional information that DR has not provided.[24]

## B. Procedural Background

---

[18] JX 122; Galbally Dep. Tr. 351:13-22.

[19] JX 88.

[20] Nguyen Dep. Tr. 34:13-35:4.

[21] Galbally Dep. Tr. 52:23-53:21; JX 38.

[22] Galbally Dep. Tr. 362:3-363:14; Trial Tr. 21:21-22:3.

[23] Galbally Dep. Tr. 364:12-17.

[24] *See* n. 49 *infra.*

On February 12, 2019, Senetas sent a written demand ("Demand") dated February 6, to inspect DR's books and records.[25]  The letter demanded the right under 8 *Del. C.* § 220 of the Delaware General Corporation Law ("Section 220") to inspect nine categories of books and records.  DR failed to respond to the Demand within the mandated five days.

On February 28, 2019, Senetas filed a complaint in which they argue that, under Section 220, it has a proper purpose to inspect DR's stocklist and books and records because the information requested "bears on questions about the true value of the Company's assets, and whether its assets and opportunities are being managed and pursued in a way that maximizes shareholder value."[26]

On April 1, 2019, DR filed an answer, in which it asserts Senetas "lacks a proper purpose . . . and, further, has an improper purpose and/or improperly seeks to use . . . the requested documents to the detriment of the Company."[27]  And, DR claims the Demand fails "to establish a credible basis from which to infer any actual or possible mismanagement or wrongdoing"; its scope is overbroad; access to sufficient information has already been provided; and confidential and

---

[25] D.I. 1, Ex. 2.

[26] *Id.* at 7.

[27] D.I. 9, at 10.

proprietary technical information should be protected from disclosure.[28] Both parties request attorneys' fees and costs.

DR and Senetas filed their pre-trial briefs on June 6, 2019, the pre-trial conference was held on June 7, 2019, and the trial on June 11, 2019.

## II. Analysis

"Stockholders of Delaware corporations enjoy a qualified right to inspect the corporation's books and records."[29] Section 220 requires that a stockholder seeking inspection of books and records: (1) be a stockholder of record; (2) comply with the form and manner requirements when making the demand; and (3) state a proper purpose for the requested inspection.[30] Section 220 defines a "proper purpose" as one "reasonably related to the party's interest as a stockholder."[31]

It is undisputed that Senetas was a stockholder of record and adhered to Section 220's form and manner requirements. The issues in this case are: (A) does

---

[28] *Id.* at 10-11.

[29] *Cf. KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 750 (Del. 2019) ("Stockholders of Delaware corporations have 'a qualified common law and statutory right to inspect the corporation's books and records.'") (citing *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002)); *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 143 (Del. 2012) (citations omitted).

[30] 8 *Del. C.* §220 (c)(1)-(3); *see also Cent. Laborers Pension Fund*, 45 A.3d at 143; *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775 (Del. Ch. 2016).

[31] *Compaq Computer Corp. v. Horton*, 631 A. 2d 1, 3 (Del. 1993) (citing 8 *Del. C.* § 220(b)); *Barnes v. Sprouts Farmers Mkt., Inc.*, 2018 WL 3471351, at *4 (Del. Ch. July 18, 2018) (citation omitted); *Rodgers v. Cypress Semiconductor Corp.*, 2017 WL 1380621, at *2 (Del. Ch. Apr. 17, 2017) (citation omitted).

Senetas have a proper purpose for seeking to inspect DR's books and records; (B) was Senetas' proper purpose offered under false pretenses, or an attempt to "side-step" the proper purpose requirement; and (C) should the inspection be conditioned on a confidentiality agreement?[32]

### A. Is Senetas' Demand for a proper purpose?

Senetas states its purpose as determining the "true value of the Company's assets, and whether its assets and opportunities are being managed and pursued in a way that maximizes shareholder value."[33] It intends to inspect the books and records "to determine if [DR] is being properly managed."[34] Senetas argues it is entitled to inspect DR's books and records for a proper purpose – to investigate mismanagement, waste and wrongdoing – and that it has demonstrated more than a credible basis from which the Court can infer possible mismanagement. It claims DR's management failed to follow corporate governance mechanics and made critical business decisions without consulting with the Board or stockholders; failed to act with due diligence related to undertaking an ICO and discontinuing efforts to pursue FDA approval of DR's product; failed to keep systematic or

---

[32] There is an additional issue whether the scope of inspection in Senetas' Demand is properly tailored to its stated purpose. I do not address that issue in this report and ask the parties to confer, once this report is final, and submit any remaining areas of disagreement on the scope of the inspection to the Court.

[33] D.I. 1, Ex. 2.

[34] *Id.*

accurate financial records; failed to keep the Board reasonably informed about DR's operations; misled investors; and breached their duty of loyalty and their employment agreements by diverting time and attention from DR's operations, and by misappropriating DR's intellectual property, to organize and promote a competitor.[35]  DR asserts that Senetas does not "articulate a cognizable purpose for much of its Demand," and that Senetas knows that "there has been no misappropriation of its investment."[36]

The predominate factor in determining whether a stockholder is entitled to inspection is the propriety of their purpose.[37]  The stockholder has the burden of showing that it has a proper purpose for seeking to inspect books and records.[38] Valuation of a stockholder's shares is a proper purpose for inspection.[39] And, it is

---

[35] D.I. 46, at 54.

[36] D.I. 43, at 1-2.

[37] *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

[38] 8 *Del. C* §220(c)(3). *Cf. Rodgers*, 2017 WL 1380621, at *3; *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998); *Helmsman Mgmt. Servs., Inc. v. A&S Consultants, Inc.,* 525 A.2d 160, 164 (Del. Ch. 1987); *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674, 678 (Del. Ch. 1978).

[39] *Cf. CM & M Grp., Inc.*, 453 A.2d at 792.  Senetas' Demand questions "the true value of [DR's] assets." *See generally Forsythe v. CIBC Emp. Private Equity Fund U.S. I LP*, 2005 WL 1653963, *4 (Del. Ch. July 7, 2005) (in the demand letter, the plaintiffs stated one of their purposes was "to determine the **value** of certain assets [held by the entity] (and thereby, the court assumes, the **value** of their units)").

well settled that the investigation of mismanagement, waste and wrongdoing is a proper purpose for inspection.[40] Stockholders "need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation," and are not required to show actual wrongdoing or mismanagement.[41] This threshold requirement "sets the lowest possible burden of proof," and may be met "by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[42] But, a stockholder "must do more than state in a conclusory manner, a generally accepted proper purpose" – the investigation of corporate mismanagement "must be to some end."[43] "Mere curiosity or a desire for a fishing expedition will not suffice."[44]

---

[40] *Cf. Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006)(stockholders may obtain information "about corporate mismanagement, waste or wrongdoing" that can be used in several ways); *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *13 (Del. Ch. May 30, 2019); *Rodgers*, 2017 WL 1380621, at *3 (citation omitted).

[41] *Seinfeld*, 909 A.2d at 123; *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1031 (Del. 1996).

[42] *Seinfeld*, 909 A.2d at 123 (citations omitted); *Louisiana Mun. Police Employees' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *2-*3 (Del. Ch. Oct. 5, 2012).

[43] *Graulich v. Dell*, 2011 WL 1843813, at *5 (May 16, 2011) (quoting *West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 646 (Del. Ch. 2006)). Stockholders "must state a reason for the purpose, i.e., what it will do with the information or an end to which that investigation may lead." *Id.* One reason that a stockholder might seek to investigate corporate mismanagement or wrongdoing is to possibly institute derivative litigation. *Seinfeld*, 909 A.2d at 119-20 (citations omitted); *Graulich*, 2011 WL 1843813, at *5 (citations omitted). Here, the Demand does not clearly state the reason it is seeking to investigate mismanagement. D.I. 1, Ex. 2. Since

10

With these principles in mind, I turn to the books and records demand in this case. Each case involving a shareholder request for inspection of corporate books and records rests on its own facts.[45] DR is a small closely held corporation, with Nguyen serving as DR's president, secretary, treasurer and bookkeeper. Its co-founders, Nguyen and Lufkin, are experts in medical imaging, and also serve as Board members. The Series Seed-1 Preferred Stock Purchase Agreement, under which Senetas became a major investor, requires that DR maintain internal accounting controls sufficient for a company of its size and type.[46] And, DR's Investors' Rights Agreement provides that DR shall furnish to each major investor "when available" DR's annual and quarterly unaudited financial statements "all prepared in accordance with generally accepted accounting principles and practices."[47]

DR does not argue concerning Senetas' failure to articulate in the Demand what it intends to do with the information, I do not address that issue.

[44] *Carapico v. Philadelphia Stock Exch., Inc.*, 791 A.2d 787, 792 (Del. Ch. 2000) (citing *Sec. First Corp. v. U.S. Die Casting & Dev. Co.,* 687 A.2d 563, 568 (Del. 1997)).

[45] *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982); *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 164 (Del. Ch. 1987).

[46] JX 37, ¶ 2.17(b).

[47] JX 35, ¶ 5.1. DR asserts that its obligation under the Investors' Rights Agreement to provide financial statements is limited to when those statements are available. DR's interpretation would allow it to avoid all obligations regarding financial statements by never preparing those statements, which conflicts with that Agreement's provision that annual and quarterly financial statements shall be furnished to major investors. It is more reasonable to interpret the language that financial statements be provided "when

Nguyen admitted that she does not use accounting programs to track income and expenses, and that she is "not a good person for all this stuff."[48]   There is no evidence that DR's management properly maintained DR's financial records or established internal accounting controls or prepared financial statements "in accordance with generally accepted accounting principles and practices," on an annual or quarterly basis (and shared those statements with its major investors).[49]

Under DR's Certificate of Incorporation ("Charter"), as amended on March 1, 2017, "the management of the business and the conduct of the affairs of the Corporation [is] vested in its Board of Directors."[50]   Contrary to the Charter, important decisions were made on behalf of DR without obtaining the Board's

---

available" as allowing flexibility in the timing of the preparation of those statements following the end of each quarter or year.

[48] Nguyen Dep. Tr. 41:1-8; 43:13; 86:1-16.

[49] DR's financial documents were missing a number of standard sections such as cash-flow statements and balance sheets, and the income statement included in the March 1, 2019 Update to investors interchanged equity with revenue. *See* JX 87; JX 88. And, although Dwyer, who inspected DR's books and records, believed "the numbers [were] correct," he also requested additional information (bank statements and information from February 2018 to present) and there is no evidence that information has been provided. Galbally Dep. Tr. 145:10-24; 366:12-19; *see* Nguyen Dep. Tr. 37:11-20; 38:22-39:16. *See generally Tanyous v. Happy Child World, Inc.*, 2008 WL 2780357, at *7 (Del. Ch. July 17, 2008) (the stockholder "must adduce '*some evidence*' that warrants further investigation of the matter," and in that case, the books and records were "in a shambles").   In addition, other corporate requirements have not been addressed – for example, DR's Charter became void on March 1, 2019 for DR's failure to make required corporate filings and pay corporate taxes. Trial Tr. 11:11-14; Del. Dep't of State: Div. of Corp. Filings, Delaware.gov (July 9, 2019).

input. Those decisions included DR's taking concrete steps towards an ICO in early 2018,[51] as well as DR's decision not to continue to pursue FDA approval.[52] This failure to adhere to proper corporate governance is also reflected in the fact that the Board met only once – in August of 2017 – while Galbally was a Board member, and no minutes of that meeting were prepared.[53] Galbally and others made requests to Nguyen that additional Board meetings be held, to no avail.[54]

Senetas asked repeatedly for updated information on DR's operations and financial status, and only limited information, primarily in the form of written

---

[50] D.I. 46, Ex. 2 (Amended and Restated Certificate of Incorporation of DeepRadiology Corporation), Art. VI (1).

[51] DR claims that an ICO never actually occurred and that DR did not accept ICO funds. Nguyen Dep. Tr. 162:4-6; JX 88. But, in January of 2018, DR had an ICO offering on its website with a clock counting down to the time when the coins would be available. Nguyen Dep. Tr. 165:2-5; *see* JX 151. Galbally discovered the impending ICO, by happenstance, and took actions, including requesting a special Board meeting and meeting separately with Nguyen, to prevent the ICO from occurring. *See* JX 151, 152; Galbally Dep. Tr. 153:4-11; 155:5-9; 160:11-19.

[52] Senetas asserts that it learned about the plan to discontinue seeking FDA approval for DR's products in September of 2018 after the decision had been made without any Board involvement. Galbally Dep. Tr. 66:19-23. DR's pursuit of FDA approval of its products was a key factor in DR's decision to invest in DR, since it understood FDA approval to be necessary to market DR's products for generating revenue. Galbally Dep. Tr. 58:2-11; 59:17-24; 61:5-12.

[53] Galbally Dep. Tr. 69:11-13.

[54] Galbally Dep. Tr. 237:11-16; *see, e.g.,* JX 152. It appears the original understanding was that the Board would hold formal meetings three times a year. JX 150. If DR has corporate documents, such as bylaws, that fix the number and timing of Board meetings, those documents have not been made available to the Court. *See* JX 37, ¶ 2.21.

updates, was provided.[55] Updates on DR's status were provided to stockholders/investors on three occasions – November 2, 2017, May 14, 2018, and March 1, 2019.[56] There are a number of ways in which information provided to Senetas and other investors could be considered misleading. Contrary to the statements in the updates, Nguyen testified that none of DR's products has been deployed and DR has had no revenue. Information provided to Senetas and others, in November of 2017, January of 2018, and March of 2019, give the inaccurate impression that DR's products were being deployed or were already deployed, and also indicated that revenue was forthcoming – anticipated "as early as the first quarter of 2018."[57] Further, there are questions about the information reported to

---

[55] *Cf.* Galbally Dep. Tr. 97:14-20; JX 57; JX 152; JX 153; JX 155. Galbally stated that he feels like he is "the orange boy." JX 55. Galbally explained that being the "orange boy" is an Australian expression related to a player who comes in to bring oranges to the team but is sent off before the coach tells the team what is happening. Galbally Dep. Tr. 199:1-15. He was not being provided with proper updates, had no detailed information about the patents or FDA approval, and "every time we seem to be starting to get trials and into hospitals, that slips and revenues slips." Galbally Dep. Tr. 199:24-200:7. When Galbally resigned from the Board in February of 2018, his reasons included his "concerns around the governance of the company, the lack of financial and legal disclosure to the Board by management." JX 124.

[56] The information from all updates is reflected in the March 1, 2019 Update. JX 88. Nguyen also provided an update to Galbally and Rankin by email on January 8, 2018. JX 157.

[57] The November 2, 2017 Update noted that "[w]e are currently deploying CT products for actual services in several major hospitals. We anticipate revenue in Q1 2018. We are planning to ramp up deployment of our products for a couple of thousand facilities in 2018." JX 88. That information is repeated in Nguyen's January 8, 2018 email. And, the March 1, 2019 Update reported that DR "achieved a major milestone, and we now have certain products commercially deployed." *Id.*

investors on the status of DR's patent applications,[58] and Nguyen and Lufkin's efforts with dmed.ai and dmed.ai's potential effect on DR's interests.[59]

Based upon the foregoing, I recommend that the Court find Senetas has met its low burden of showing sufficient evidence for the Court to infer possible mismanagement and wrongdoing at DR. DR has not shown it has systematic record-keeping procedures or a detailed accounting documenting its financial affairs; that proper governance procedures were followed since major decisions were made without Board knowledge or approval; and some of the information provided to stockholders was misleading. Senetas should be given the information necessary to effectively address these concerns.[60]

---

[58] *See* JX 88 (November 2, 2017 Update states "[w]e now have filed seven patents with USPTO and 6 more are in the pipeline"; March 1, 2019 Update states there were eight patent applications filed between January 4, 2017 and August 9, 2018); JX 170 (patent lawyer states there are seven pending patent applications for DR as of June 6, 2019). Senetas questions why none of DR's patent applications have been made publicly available since patent applications generally become public after 18 months and seven applications are significantly older than 18 months. Trial Tr. 46:17-22.

[59] Senetas was not aware of Nguyen and Lufkin's new dmed.ai initiative until receiving information in the May 14, 2018 Update about the proposal to roll DR into dmed.ai, a new company formed by Nguyen and Lufkin. JX 88. When Galbally and Rankin met with Nguyen on March 1, 2018, she stated she was traveling to South Korea to speak at a competition on behalf of DR. Galbally Dep. Tr. 160:19-23; 161:4-7. Senetas subsequently learned that the award received in South Korea in March of 2018 was not for DR but for dmed.ai. *See* JX 147; D.I. 46, at 26. However, DR later abandoned the plan to roll DR into dmed.ai. Nguyen Dep. Tr. 239:23-240:4, 242:24-243:3.

[60] DR argues that Senetas knows that "its investment was not…misappropriated" pointing to DR's recognition, through its international medical artificial intelligence challenge award, to demonstrate its valuable technology. D.I. 43, at 2. It is not the value of DR's

### B. Was Senetas' proper purpose offered under false pretenses, or an attempt to "side-step" the proper purpose requirement?

DR claims that Senetas is wholly or primarily driven by its desire to gain competitive access to DR's artificial intelligence technology and human resources for use in Senetas' cyber-security business, or for EON Reality, Inc. ("EON"), another company in which Senetas has invested.[61] DR further argues that Senetas attempted to destroy DR when it publicly wrote off its investment in DR, and by actively interfering with DR's business and investor relationships.[62] Senetas responds that it is not a competitor since DR's artificial intelligence technology for the medical field is not of any value to Senetas, whose business relates to "encrypting communications in government systems."[63]

A "defendant may not rebut a proper purpose solely by demonstrating that a secondary improper purpose or additional ulterior motive also exists."[64] "[O]nce a proper purpose has been established, any secondary purpose or ulterior motive of

---

technology that is at issue here, but DR's actions with regard to its funds and its stockholders, which support the inference of possible mismanagement and wrongdoing.

[61] D.I. 43, at 17-18.

[62] *Id.* at 19-20.

[63] Trial Tr. 115:7-116:6. Senetas argues that artificial intelligence is not "some monolithic thing that works for everybody." Trial Tr. 117:3-8.

[64] *Caspian Select Credit Master Fund Ltd. v. Key Plastics Corp.*, 2014 WL 686308, at *4 (Del. Ch. Feb. 24, 2014); *Carapico v. Philadelphia Stock Exch., Inc.*, 791 A.2d 787, 791 (Del. Ch. 2000) ("[t]he existence of a secondary purpose does not defeat plaintiff's claim that his purpose is *bona fide*").

the stockholder becomes irrelevant."[65] Instead, the defendant must demonstrate that the stockholder's stated purpose was offered under false pretenses, or an attempt to "side-step" the proper purpose requirement, and is improper.[66] And, "[a]n examination of books and records to ascertain the condition of corporate affairs and the propriety of certain actions is a proper purpose even though the one who seeks the inspection may be hostile to management" or a business competitor.[67] "A stockholder's status as a competitor may limit the scope of, or require imposing conditions upon, inspection relief, but that status does not defeat the shareholder's legal entitlement to relief."[68]

Here, Senetas has established a proper purpose of investigating wrongdoing or mismanagement, so the Court discounts any purported or actual secondary or ulterior motive, unless DR shows that Senetas' stated purpose is not its actual

---

[65] *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982); *see also Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998) ("Proper purpose has been construed to mean that a shareholder's *primary purpose* must be proper, irrespective of whether any secondary purpose is proper."); *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674, 678 (Del. Ch. 1978).

[66] *Caspian Select Credit Master Fund Ltd.*, 2014 WL 686308, at *4; *Carapico*, 791 A.2d at 791.

[67] *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 129 (Del. Ch. 1969); *see also BBC Acquisition Corp. v. Durr-Fillauer Med., Inc.*, 623 A.2d 85, 90 (Del. Ch. 1992).

[68] *Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 124 (Del. Ch. 2000); *see also Jefferson v. Dominion Holdings, Inc.*, 2014 WL 4782961, at *2 (Del. Ch. Sept. 24, 2014) (holding that courts do not have to resolve whether the stockholder seeking inspection has a secondary, ulterior motive because "confidentiality concerns can be adequately protected by a confidentiality order").

purpose. DR claims that Senetas' real purpose is to gain access to DR's artificial intelligence technology and experts for its own purposes as a competitor and is adverse to DR's interests. DR points to Senetas' public announcement when it invested in DR and its involvement with EON to show that Senetas is a competitor who wants access to DR's technology and experts.[69]

Senetas claims it is not a competitor to DR since its business is encrypting communications in government systems, military and government communications, it has no involvement with assisted analysis of medical imaging data, radiology or healthcare, and artificial intelligence technology is not one size fits all so DR's technology is not useful to it.[70] It appears that, at the time Senetas announced its investment in DR, it believed that a relationship with DR and DR's personnel, and a "joint collaboration" would be valuable. That said, DR has not met its burden to show that Senetas is a competitor to DR. The potential for a "joint collaboration" between Senetas and DR does not necessarily mean they are competitors. Senetas operates in a different market than DR and there is no

---

[69] Senetas' May 11, 2017 press release announcing its investment in DR includes a quote from Senetas' CEO: "Senetas needs access to the world's greatest minds in computing science and especially deep learning if it is going to remain a global leader in cyber security solutions. This investment not only gives us access to these people but it is structured to allow joint technology collaboration between Senetas and DeepRadiology on researching and developing machine learning based solutions for analyzing and protecting network data in transit." JX 158.

[70] *See* Trial Tr. 115:10-116:10.

evidence that Senetas is trying to enter the healthcare field or that DR's artificial intelligence technology, in its current form, is transferable to the cybersecurity field.

DR also asserts that Senetas' stated purpose is not its actual purpose and that its intention is to harm DR, as evidenced by publicly announcing its write down of its investment in DR and its counsel's letters to DR's partners/experts.[71] Senetas publicly announced on August 27, 2018 that it was writing down the carrying value of its investment in DR to "nil," after acknowledging that DR's failure to achieve FDA approval for its technology and missing "milestone and projected revenue targets."[72] Although Senetas understood that such an action could negatively affect DR's future funding,[73] it states that, as a publicly traded company in Australia, it is required to review its carrying value of its investments semi-annually and, when appropriate, write down its investments, such as it did with

---

[71] DR also argues that Senetas, an EON investor, began its efforts to destroy DR after DR turned down EON's investment in DR. D.I. 43, at 18-19. There is not sufficient evidence to support that claim. Based upon the evidence, it appears more likely that Senetas, in its efforts to support additional funding for DR, promoted investment in DR by other entities with which it had a relationship, such as EON. *See* JX 114.

[72] Galbally Dep. Tr. 52:23-53:21; JX 38.

[73] *See* JX 150.

DR, in a public way.[74]  I do not find that Senetas' primary purpose in publicly announcing its write down of the DR investment was to harm DR.[75]

DR also argues that letters sent to DR's partners/experts by Senetas' counsel on June 4, 2018 were intended as a threat, "deliberately designed to disrupt any relationship between the recipients of the letters and [DR]."[76]  Those letters related to the dispute between DR and dmed.ai, and sought information from recipients about their involvement with dmed.ai.[77]  I do not find that Senetas' intention in sending the letters was to harm DR, since the letters focused on Nguyen and Lufkin's possible move from DR to dmed.ai, which would not have benefitted DR.

Finally, I conclude that DR has not met its burden of showing that Senetas' stated purpose is not its actual purpose.  And, many of DR's concerns about Senetas' intentions, including Senetas' competitive access to DR's technology and

---

[74] According to Galbally, this was necessary to ensure that the value of Senetas' assets were properly reflected on Senetas' balance sheet for accounting purposes. Galbally Dep. Tr. 55:8-12; Trial Tr. 59:9-21.

[75] DR also claims Senetas intended to harm DR by not giving DR advance notice of its public announcement to write down its investment. Trial Tr. 71:21-72:19.  DR was aware that Senetas' auditors conducted semi-annual reviews of the value of Senetas' investments and of the possibility that Senetas would write down its investment in DR. *See* Trial Tr. 72:2-6; JX 150. The failure to provide advance notice does not, in itself, show Senetas intended to harm DR.

[76] Trial Tr. 73:16-74:16.

[77] JX 62; JX 63; JX 64; JX 65.

experts and the protection of its confidential information, can be addressed through a confidentiality agreement/order.

## C. Should the inspection be conditioned on a confidentiality agreement?

One common limitation on a stockholder's inspection under Section 220 is to condition the inspection on the stockholder entering into a reasonable confidentiality agreement, in recognition of the corporation's legitimate interest in safeguarding highly confidential information from its competitors.[78] DR asks that the production of any documents be subject to a confidentiality order, and Senetas agrees.[79] For many of DR's concerns, I am convinced that a confidentiality agreement can safeguard that information and adequately protect DR from potential harm. Therefore, I condition Senetas' inspection rights on its entering into such an agreement with DR and filing it for the Court's approval.

---

[78] *Cf. Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796-97 (Del. Ch. 2016); *Jefferson v. Dominion Holdings, Inc.*, 2014 WL 4782961, at *2 (Del. Ch. Sept. 24, 2014) ("Confidentiality agreements provide a rational, reasonable, and enforceable methodology for dealing with corporate books and records that otherwise would not be subject to public review."); *Schoon v. Troy Corp.*, 2006 WL 1851481, at *2 (Del. Ch. June 27, 2006), *clarified on denial of reargument*, 2006 WL 2162036 (Del. Ch. July 24, 2006).

[79] DR argues "there should be a confidentiality order providing that Senetas will not disclose the information to third parties or use it for any purpose other than the purpose set forth in its demand." Trial Tr. 108:18-23; 110:11-18. Senetas agrees that a confidentiality agreement or protective order will protect documents provided under Section 220 from improper disclosure or usage. Trial Tr. 122:2-123:3.

## III.    **Conclusion**

For the foregoing reasons, I find Senetas has established a credible basis from which the Court can infer that mismanagement or wrongdoing may have occurred, and DR has not shown that Senetas has an ulterior motive negating its proper purpose. I condition inspection of the parties entering into a confidentiality agreement. I do not address the scope of the inspection in this report. The parties presented evidence in their pre-trial briefs and at trial on the scope of Senetas' inspection of DR's books and records. Given that the parties have the benefit of the findings in this report regarding proper purpose, once this report becomes final, the parties should confer regarding specific documents or categories of books and records that are necessary, sufficient and essential to Senetas' proper purpose, and regarding a confidentiality agreement/order. They should submit to the Court any specific items of disagreement on the scope of the inspection, or on the confidentiality agreement/order, that remain following those discussions. This is a final report and notice of exceptions shall be filed within three days of the date of this report, pursuant to Court of Chancery Rule 144(d)(2), given the expedited and summary nature of Section 220 proceedings.

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery

22