# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MICHAEL J. DONNELLY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) C.A. No. 2018-0892-SG |
| | ) |
| KERYX BIOPHARMACEUTICALS, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

# MEMORANDUM OPINION

Date Submitted: July 10, 2019
Date Decided: October 24, 2019

Peter B. Andrews, Craig J. Springer, and David M. Sborz, of ANDREWS & SPRINGER LLC, Wilmington, Delaware; OF COUNSEL: Randall J. Baron, David T. Wissbroecker, and Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California and Nashville, Tennessee, *Attorneys for Plaintiff.*

David E. Ross and S. Michael Sirkin, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: Peter L. Welsh, Christian Reigstad, and Mary Zou, of ROPES & GRAY LLP, New York, New York, *Attorneys for Defendant.*

GLASSCOCK, Vice Chancellor

What follows is, for me at least, a rare bird; a written Section 220 decision. This Memorandum Opinion addresses Plaintiff's Section 220 demand for books and records from Keryx Biopharmaceuticals, Inc. ("Defendant" or "Keryx") related to its 2018 merger with Akebia Therapeutics, Inc. ("Akebia"). The Plaintiff seeks books and records relevant to alleged breaches of the duty of loyalty and improper disclosure. The Defendant asserts that the Plaintiff's purpose is pretextual,[1] requiring dismissal under the rationale of *Wilkinson v. A. Schulman, Inc.*[2] The Plaintiff, in turn, asks me to find that the Defendant has opposed its document demand in bad faith, and to shift attorney's fees accordingly. Because these issues seemed best addressed in writing, this Memorandum Opinion has followed. For the reasons stated below, I grant the Plaintiff's 220 demand. I do not find bad faith and accordingly do not shift attorney's fees.

## I. BACKGROUND

What follows is an adumbration of the facts sufficient to the issues before me. Keryx, a Delaware corporation, is a commercial stage biopharmaceutical company that develops and markets medicines for kidney disease.[3] Its marketed product, Auryxia, is approved by the FDA and is also available in Japan and Europe.[4] Prior

---

[1] The Defendant also disputes that the Plaintiff has shown a credible basis to imply wrongdoing.

[2] 2017 WL 5289553 (Del. Ch. Nov. 13, 2017).

[3] Joint Pre-Trial Stipulation and Order ("Pre-Trial Order") ¶ 1; JX 5, at 5; JX 8, at 26.

[4] JX 5, at 5; JX 8, at 26.

to Keryx's merger with Akebia, Baupost Group Securities, L.L.C. ("Baupost") was Keryx's largest stockholder, with an approximate 21.4% stake of outstanding Keryx common stock.[5] Baupost also held approximately $164.75 million of Keryx's senior notes, which were convertible into common stock.[6] If converted, the notes would give Baupost approximately a 39% ownership stake.[7] Keryx listed Baupost in its 10-K as its largest stockholder and one that "through its equity interests, may have significant influence over matters submitted to [Keryx's] stockholders for approval and other corporate actions. . . ."[8] In addition to its ownership interest, Baupost had a contractual right to appoint one director and one observer to Keryx's seven-director board (the "Board").[9]

In September 2017, John Butler—Akebia's President and CEO—resigned as Baupost's appointee on the Keryx Board.[10] That month, Baupost replaced Butler

---

[5] JX 8, at 17, 189-90.

[6] JX 8, 79–80, 189–90.

[7] JX 5, at 38.

[8] *Id.*

[9] JX 1, at 149–50, 156; JX 7, at 18.

[10] JX 7, at 13, 18, 46; JX 3, at 1–2. The parties disagree about whether Butler was CEO of Akebia and Chairman of Keryx simultaneously. The press announcement regarding Enyedy's appointment indicates that Butler was "chairman of the Keryx board of directors and president and chief executive officer of Akebia Therapeutics, Inc." JX 3, at 1. Keryx's counsel, however, represented at trial that there was no overlap between these positions. Trial Tr. 63:21–64:5.

with a new director, Mark Enyedy.[11]  The remainder of the Board, with the exception

of then-CEO Greg Madison, were non-management, outside directors.[12]

In December 2017, the Board formed a special committee (the "Committee"),

chaired by Baupost's appointee, Enyedy, to explore a merger with Akebia, as well

as other potential alternatives.[13]  The Committee hired Perella Weinberg Partners as

a financial advisor and engaged in discussions with Akebia and two other parties

based on a review of eight potential strategic partners or acquirers.[14]  During this

process, Keryx communicated with Baupost to ensure its support.[15]  In early

February 2018, Keryx, at the Committee's recommendation, declined to go forward

with Akebia, citing concerns with Akebia's development stage, the timing of its

clinical program, and the companies' respective balance sheets and cash positions.[16]

Discussions between Keryx and Akebia ceased.[17]

Shortly thereafter, Keryx reopened explorations in a broader field.[18]  It

engaged a new financial advisor, MTS Health Partners ("MTS"), and the Committee

---

[11] JX 7, at 13, 18, 46; JX 3, at 1–2.

[12] JX 7, at 12.

[13] JX 8, at 82.

[14] *Id.* at 80.

[15] *Id.*

[16] *Id.* at 84.

[17] *Id.*

[18] *Id.* at 84–85.

authorized management to enter preliminary discussions with a broad range of potential partners.[19] The Committee engaged with several parties, but none was interested in an acquisition of or merger with Keryx.[20]

While Keryx was exploring these options in March 2018, and at a time shortly after Keryx's board had determined that a merger with Akebia was not in Keryx's interest, Baupost conducted its own due diligence on Akebia.[21] Then, in late April, Madison resigned from his position as CEO of Keryx, and the Board appointed Jodie Morrison as interim CEO.[22] At the same board meeting, Baupost provided Keryx with access to its due diligence on Akebia.[23] The Board directed Morrison to inquire whether Akebia would be interested in reengaging in discussions regarding a potential transaction.[24] Recognizing certain conflicts, the Board re-constituted the Committee, this time with CEO Morrison as chairman, alongside two independent, non-management directors.[25] Over the next two months, Keryx and Akebia engaged in due diligence and merger negotiations.[26]

---

[19] *Id.* at 84.

[20] *Id.* at 85.

[21] *Id.*

[22] *Id.*; JX 6.

[23] JX 8, at 85.

[24] *Id.*

[25] *Id.* at 86.

[26] *Id.* at 85–93.

4

As a part of the discussions, Keryx *and* Akebia also engaged with Baupost concerning early conversion of Baupost's senior notes.[27] Baupost requested consideration, and the parties ultimately formed an agreement under which Baupost received four million additional shares of common stock, valued at approximately $20 million, in exchange for early conversion of its notes.[28]

In addition, several Keryx officers received monetary or employment benefits related to the transaction. On May 1, 2018, with merger negotiations in their nascent stages, Keryx entered into retention agreements with three named executives (besides Morrison) adding an approximate combined $450,000 in single-trigger bonuses for a change-of-control.[29] Morrison's term as interim CEO was originally set to expire on October 31, 2018, but she entered an employment agreement to remain through the earlier of the close of the merger or the end of the year.[30] Under the terms of her extended employment agreement, Morrison received a $150,000 cash payment in October for her "considerable efforts" since her hiring in May, as well as a potential $200,000 cash retention payment upon closing.[31] Morrison and

---

[27] *Id.* at 86–91.

[28] *Id.* at 88–91.

[29] *Id.* at 140–42.

[30] *Id.* at 139.

[31] *Id.*

four other Keryx directors were tapped to become Keryx's designees on the combined company's board.[32]

Ultimately, the Committee recommended the merger, and on June 27, 2018 the Board unanimously approved.[33] The parties executed the Merger Agreement the following day.[34] The stockholders approved the merger on December 11, 2018, and the merger closed on December 12.[35]

According to the Complaint, inadequate disclosures in the proxy precluded Keryx stockholders from making an informed decision about the merger.[36] Specifically, Plaintiff alleges that Keryx failed to disclose the reasons behind Madison's resignation as well as the reasons for the exit of the Board's initial financial advisor, Perella Weinberg Partners.[37] Plaintiff also alleged that Keryx adjusted certain financial projections with the intent to mislead Keryx stockholders into supporting the merger.[38] Finally, he contended that Keryx failed to adequately disclose either Baupost's role in the sales process—given its side-agreement—or

---

[32] *Id.* at 137.

[33] *Id.* at 93.

[34] *Id.* at 94.

[35] JX 27, at 2.

[36] Docket Item ("D.I.") 1 ¶ 19.

[37] *Id.*

[38] *Id.* ¶ 16. The financial projections can be found at JX 8, at 103–105.

why the Board renewed the sales process after it initially declined to move forward with Akebia.[39]

On November 26, 2018, Donnelly served a demand letter on Keryx (the "Demand Letter") under Section 220 of the Delaware General Corporation Law.[40] In his demand, sent by his counsel at Robbins Geller Rudman & Dowd LLP ("Counsel" or "Plaintiff's Counsel"), Donnelly cited concerns with possible breaches of loyalty based on the fairness of the merger price, potential influence by Baupost, the bonuses paid in connection with the merger, the independence and disinterestedness of the directors, and the disclosure issues identified above.[41] Keryx responded on December 3, 2018 and refused to produce any of the demanded books and records for inspection.[42] Donnelly filed this action on December 10, 2018.[43] To date, Keryx has not produced any books and records in response to the Demand Letter.[44]

---

[39] D.I. 1 ¶ 19.

[40] Pre-Trial Order ¶ 4.

[41] JX 9, at 5–8.

[42] Pre-Trial Order ¶ 5.

[43] *Id.* ¶ 6–7.

[44] *Id.* ¶ 11.

## II. ANALYSIS

"Stockholders of Delaware corporations enjoy a qualified . . . right to inspect the corporation's books and records."[45]  Qualified, that is, in order to balance stockholders' legitimate need, as stockholders, to inspect corporate documents, against the company's interest in avoiding excessive and disruptive, and perhaps nefarious, inquiries.  Section 220 requires that a stockholder seeking inspection of books and records (1) be a stockholder of record, (2) comply with the form and manner requirements when making the demand, and (3) state a proper purpose for the requested inspection.[46]  This dispute centers solely on the proper purpose requirement and whether the Defendant responded properly to Plaintiff's demand.

### A. Plaintiff Stated a Proper Purpose to Investigate a Breach of the Duty of Loyalty

A plaintiff stockholder carries the burden of showing a proper purpose for inspection of books and records.[47]  Section 220 defines a "proper purpose" as one "reasonably related to the party's interest as a stockholder."[48]  Investigation of

---

[45] *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 750 (Del. 2019) (citing *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002)); *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 143 (Del. 2012).

[46] 8 *Del. C.* § 220(c); *see also Cent. Laborers*, 45 A.3d at 144; *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775 (Del. Ch. 2016).

[47] 8 *Del. C*. §220(c); *see also Rodgers v. Cypress Semiconductor Corp.*, 2017 WL 1380621, at *3 (Del. Ch. Apr. 17, 2017); *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998).

[48] 8 *Del. C.* § 220(b).

mismanagement, waste, and wrongdoing is a proper purpose for inspection, assuming it is directed ultimately to some stockholder-related end, such as making a litigation demand or bringing a derivative action.[49] On the other hand, "[a] corporate defendant may resist demand where it shows that the stockholder's stated proper purpose is not the actual purpose for the demand."[50] This requires the defendant to prove false pretenses, which "is fact intensive and difficult to establish."[51] One subspecies of false pretenses, our courts have held, is present where the litigation is entirely lawyer—not client—driven. Such a situation was presented to this Court in *Schulman*.[52] In *Schulman,* the court found a fatal misalignment of goals between the stockholder and his counsel, noting that the demand "differed substantially" from the stockholder's expressed concerns.[53] The

---

[49] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006); *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *13 (Del. Ch. May 30, 2019); *Rodgers*, 2017 WL 1380621, at *3.

[50] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007) (citing *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156 (Del. Ch. 2006), *aff'd sub nom. Highland Equity Fund, L.P. v. Motient Corp.*, 922 A.2d 415 (Del. 2007)).

[51] *Pershing Square*, 923 A.2d at 817.

[52] *Wilkinson v. A. Schulman, Inc.*, 2017 WL 5289553, at *3 (Del. Ch. Nov. 13, 2017).

[53] *Id.* at *3 ("This is not a situation in which the stockholder client initiated the process, then counsel drafted a demand. The event that prompted Wilkinson to seek books and records differed substantially from what [his counsel] chose to explore.").

court found false pretenses because the stockholder "simply lent his name" to his counsel for the litigation, which was itself entirely lawyer-driven.[54]

The Defendant here points to the deposition of the Plaintiff as failing the *Schulman* "test." As this Court noted in *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*,[55] *Schulman* did not announce a new Section 220 test; rather, the court in *Schulman* found that a certain set of facts proved the stockholder's stated purposes were pretextual.[56] The Defendant in this case points to a misalignment of the reasons for investigation the Plaintiff articulated at his deposition, and those set forth in the demand. Specifically, the Demand Letter sent by Plaintiff's Counsel on Donnelly's behalf named disclosure as one of his concerns.[57] At his deposition, when asked what concerns motivated filing the demand, Donnelly named the deal price, the change of leadership, the bonuses, potential board conflicts, and Baupost's influence.[58] Despite repeated inquiries, he did not name disclosure as a concern until prompted, and when prompted, it became evident he had not reviewed the merger

---

[54] *Id.* at *2 ("In this case, the trial record established that the purposes for the inspection belonged to Wilkinson's counsel . . . and not to Wilkinson himself. Wilkinson simply lent his name to a lawyer-driven effort by entrepreneurial plaintiffs' counsel.").

[55] 2019 WL 479082 (Del. Ch. Jan. 25, 2019).

[56] *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *9 n.99 (Del. Ch. Jan. 25, 2019) ("I do not read Schulman as announcing a rigid test for when a purpose will be improper under Section 220.").

[57] JX 9, at 5–8.

[58] Donnelly Dep. at 18:8–20:15; 61:7–65:5.

proxy to see what the companies had already disclosed.[59]  After further questioning, Donnelly testified that even had he received the disclosures he now argues were required, he still would have opposed the merger based on fairness concerns.[60]

The Defendant argues that adequate disclosure is solely the concern of Donnelly's counsel, and not Donnelly.  As such, Defendant maintains the Plaintiff has not stated a proper purpose in seeking documents relating to disclosure.  Unlike the 220 demand in *Schulman*, where the misalignment between the stockholder's interest and the demand was total,[61] here Donnelly expressed a proper purpose regarding investigating breach of fiduciary duty in way of the merger.[62]  This is not a case of a pretextual, lawyer-driven demand as in *Schulman*.  I do not find evidence of false pretenses for the Plaintiff's stated concerns over a possible breach of the duty of loyalty.  The Defendant points out that the Demand Letter is drafted from a template used by Plaintiff's Counsel, but this is not proof that the client did not have individual concerns placed into the template to create the Demand Letter.

---

[59] *See id.* at 101:23–102:17.

[60] *Id.* at 103:4–105:15.

[61] The *Schulman* case states that the concerns of the plaintiff and his counsel "differed substantially," and the difference was stark: the plaintiff was concerned about financial performance, while his counsel, through the demand letter, investigated the acceleration of restricted stock awards to the CEO.  *Wilkinson v. A. Schulman, Inc.*, 2017 WL 5289553, at *2 (Del. Ch. Nov. 13, 2017).

[62] *See* Donnelly Dep. at 18:8–20:15; 61:7–65:5; 183:22–184:15.

11

Moreover, having found a proper purpose in investigating wrongdoing in way of a derivative—or direct damages—action,[63] it was appropriate for Counsel to request disclosure-related documents as well, since, under our case law, that information would be necessary to the client's purpose.[64]  I turn, therefore, to whether the record demonstrates a credible basis from which to infer wrongdoing.

### B. Plaintiff Offered a Credible Basis for His Demands Regarding a Breach of the Duty of Loyalty

To meet his burden for inspection, the Plaintiff "need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation."[65]  As our courts have often noted, where, as was initially intended here, a plaintiff must meet the high bar of specific pleading to sustain derivative litigation, she should avail herself of the tools at hand under Section 220 to aid in crafting the required pleading.  Accordingly, the credible basis test must not be so rigorous that derivative litigation is precluded, as a practical matter.[66]  Accordingly, a plaintiff is not required to show that wrongdoing or mismanagement are actually

---

[63] The demand was made pre-closing, but only a direct action is now available given the merger.

[64] *See Corwin v. KKR Fin. Holdings LLC, 125 A.3d 304, 312 (Del. 2015).*

[65] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006); *see also Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1031 (Del. 1996).

[66] Nor so low that it promotes inefficient fishing for purely speculative wrongdoing.

12

occurring.[67]  Her burden of proof may be met "by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate *issues* of wrongdoing."[68]

Plaintiff's evidence, I find, is sufficient to suggest that Baupost was in a control position, from which, aided by the company's directors, it extracted an additional benefit not shared with the non-Baupost stockholders. The Defendant contends the Plaintiff has relied on a theoretical narrative, rather than pointing to concrete evidence of wrongdoing.  But the Plaintiff need not offer specific, tangible evidence of his claim.[69]  Rather, he needs to show some evidence that casts an inference of actionable wrongdoing.[70]  While the Plaintiff is far from demonstrating the theory he posits, he clears the low hurdle set here by our law.

Plaintiff offered some evidence that Baupost had an improper influence on the merger.  Baupost was the largest blockholder, with the ability to wield nearly 40%

---

[67] *Seinfeld*, 909 A.2d at 123; *Thomas*, 681 A.2d at 1031.

[68] *Seinfeld*, 909 A.2d at 123 (emphasis added) (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)); *Louisiana Mun. Police Employees' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *2–3 (Del. Ch. Oct. 5, 2012) (quoting *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *6 (Del. Ch. Feb. 12, 2009) *aff'd*, 977 A.2d 899 (Del. 2009)).

[69] *See Oklahoma Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2014 WL 5351345, at *6 (Del. Ch. Sept. 30, 2014).  Vice Chancellor Noble adopted this Master's final report in *Oklahoma Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2015 WL 1884453 (Del. Ch. Apr. 24, 2015).

[70] *See Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *11 (Del. Ch. Jan. 25, 2019).

of the voting control of the entity.[71] It also had financial leverage, as well as an appointee and an observer on the Board.[72] After the Board abandoned the initial merger effort, I can infer that Baupost disagreed; it continued to pursue diligence with Akebia. Ultimately, I may infer, Baupost convinced the Board to resume consideration of the merger, and provided the board with its conclusion in favor of the merger with Akebia, based on its own evaluation. The board, rather than reengaging the financial advisor whose advice, I can infer, influenced its initial rejection of Akebia as a merger partner, relied on its new advisor to support the contemplation of the merger. Meanwhile, Baupost negotiated the valuable side deal advancing its debt-equity conversion, in negotiation with both sides of the merger, Akebia *and* Baupost.

If Baupost were a controlling blockholder, the merger could be subject to entire fairness review.[73] Having raised a reasonable inference of such control, Plaintiff is entitled to investigate whether Baupost improperly "compete[d] with the common stockholders for consideration in a sale of the corporation to a third

---

[71] *See* JX 5, at 38 ("If Baupost converts all of the convertible notes it holds into shares of [Keryx's] common stock, Baupost would beneficially own approximately 39% of [Keryx's] issued and outstanding common stock.").

[72] JX 8, 79–80, 189–90; JX 1, at 149–50, 156; JX 7, at 18.

[73] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *14 (Del. Ch. Oct. 24, 2014) ("triggering entire fairness review requires the controller or control group to engage in a conflicted transaction. That conflicted transaction could involve . . . receiving different consideration than the other stockholders.").

party."[74]  Inquiry into control is a threshold issue for whether these higher duties existed.

Demonstrating control by a stockholder who owns less than 50% of a company requires showing the minority stockholder "exercised actual domination and control over the directors."[75]  While demonstrating actual control by a minority blockholder is "not easy,"[76] the Plaintiff does not need to demonstrate actual control to prevail here.  From the facts, I can infer that Baupost had significant influence on Keryx, as the company itself disclosed to stockholders, that it exercised direct influence on the Board through its appointees, that it revived the merger when it otherwise might have died, that its approval was a prerequisite for the merger, and that it obtained, in connection with the merger, a side-agreement valued at $20 million, a benefit not shared with unaffiliated stockholders.[77]  I find that the Plaintiff has met his burden to point to some evidence sufficient to imply that this was a conflicted transaction investigation of which is a proper purpose. [78]

---

[74] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017).

[75] *In re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656 (2013) (alterations omitted) (quoting *In re Sea–Land Corp. S'holder Litig.*, 1988 WL 49126, at *384 (Del. Ch. May 13, 1988)); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[76] *In re Rouse Properties, Inc.*, 2018 WL 1226015, at *11 (Del. Ch. Mar. 9, 2018) (citing *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[77] JX 5, at 38; JX 8, at 17, 189-90; JX 1, at 149–50, 156; JX 7, at 18; JX 7, at 13, 46; JX 3, at 1–2; JX 8, at 80, 85, 88–91.

[78] *See Kosinski v. GGP Inc.*, 214 A.3d 944, 953 (Del. Ch. 2019).  In *Kosinski*, this Court weighed a stockholder with a 34% interest, power to replace one-third of the board of directors, and mention in the company's 10-K, and it determined that "*[i]n the Section 220 context*, these facts

15

Similarly, the Plaintiff has offered some evidence that crosses the low threshold to show conflicted management and directors. The payments to Morrison, as Keryx points out, are of a type not unusual in corporate mergers, but here Morrison also served as chairperson of the Committee that negotiated and then recommended the merger, and in addition to further change-of-control bonuses added late in the game, she and four other legacy Keryx directors were tapped for seats on the surviving company's board of directors.[79] Three other named executives also received change-in-control bonuses after merger negotiations had begun.[80] This is enough to give the Plaintiff the right to investigate whether the interests of Morrison, along with other management and directors, were fully aligned with the stockholders.

Given the findings above, the Plaintiff is also entitled to documents reflecting the extent to which any potential wrongdoing was appropriately disclosed in the proxy.

---

are enough to demonstrate the *possibility* that [the stockholder] was a de facto controller at the time of the merger." *Id.* (all emphasis added). The situation here, if not identical, is comparable: Baupost could convert into a stake larger than the stake held in *Kosinski*; it had the power to appoint a director and observer; and, unlike in *Kosinski*, it had a financial interest in the merger that required its cooperation and approval for the transaction to complete.

[79] *See* JX 8, at 86, 137, 139.

[80] *Id.* at 140–42.

*C. Plaintiff is Not Entitled to Fee Shifting*

Finally, I address the issue of the Plaintiff's request that I order Defendant to pay his legal fees. Delaware follows the American rule on fees and costs, and in a Section 220 action, each party bears its own attorney's fees unless there is an exception to that rule. The Plaintiff locates that exception in what he characterizes as the Defendant's bad-faith litigation conduct. Allegations of bad faith, unfortunately, are not rare birds in this Court; in fact, they are becoming the starlings of misplaced motion practice.

In order to support his request for fee shifting, the Plaintiff must point to "clear evidence" of "bad faith in opposing the relief being sought in the lawsuit."[81] Bad faith is not something this court takes lightly, and it should not be alleged lightly. Plaintiff's Counsel, citing *McGowan v. Empress Entm't, Inc.,*[82] argues I should award attorney's fees because the Defendant's conduct forced a lawsuit to secure a clearly defined, established legal right. *McGowan*, I note, involved egregious facts: the company promised a director certain documents; put off making good on the promise for eighteen months, leading to litigation; then offered opposition in that litigation, only to capitulate after the plaintiff filed a motion for summary

---

[81] *McGowan v. Empress Entm't, Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000).
[82] 791 A.2d 1 (Del. Ch. 2000).

17

judgement.[83]  The Plaintiff, to my mind, can point to nothing similar here, only a vigorous but good-faith dispute over purpose and scope.  Bad faith means a litigation position in furtherance of abuse of process that is manifestly incompatible with justice.  It means frivolous opposition in an attempt to game the system.  None of this should be confused with the vigorous litigation here.[84]  Plaintiff's request to shift fees is denied.

### III. CONCLUSION

The Plaintiff is entitled to corporate documents necessary to the purpose stated in his demand.  The parties should confer on the proper scope.

---

[83] *Id.* at 2–3.

[84] The Plaintiff points to the Defendant's assertion of pretextual purpose under *Schulman* as evidence of bad faith.  But the still-developing nature of this Court's application of *Schulman* is antithetical to the contention that the Defendant's argument here was beyond the bounds of proper litigation.  I note, however, that corporations do have an affirmative statutory obligation to provide books and records, as appropriately demanded by their stockholders, under Section 220.  I can readily image a situation where a legitimate books and records request, met by company intransigence leading to needless litigation, rises to bad faith and justifies sanctions.