**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

Date Submitted: August 31, 2021
Date Decided: November 18, 2021

Nicholas G. Kondraschow, Esquire
Rhodunda, Williams &
Kondraschow
1521 Concord Pike, Suite 205
Wilmington, DE 19803

David J. Teklits, Esquire
Thomas P. Will, Esquire
Morris, Nichols, Arsht & Tunnel LLP
1201 North Market Street
Wilmington, DE 19801

Re: *Georgia Notes 18, LLC v. Net Element, Inc.*
C.A. No. 2021-0246-JRS

Dear Counsel:

Plaintiff, Georgia Notes 18, LLC, has demanded to inspect certain books and records of Defendant, Net Element, Inc. ("Net Element" or the "Company"), under 8 *Del. C.* § 220. The Company objects to Plaintiff's demand on several grounds, including that Plaintiff has failed to state a proper purpose for inspection. After carefully considering the evidence presented at trial and the arguments of counsel, I agree with the Company that Plaintiff has failed to prove a proper purpose. Specifically, the preponderance of the evidence reveals that Plaintiff's purpose for

inspection is to advance its interest as a creditor of the Company, not its interests as a stockholder.  My reasoning follows.

## I.  BACKGROUND

The Court presided over a one-day trial on August 31, 2021.[1]  The following facts were either stipulated to or proven by a preponderance of the evidence.[2]

### A. The Parties

Defendant, Net Element, Inc., is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.[3]  Plaintiff, Georgia Notes 18, LLC, is a Florida limited liability company that has continuously owned Net Element stock since July 2014.[4]

---

[1] Pre-Trial Stip. and Order (D.I. 23) ("PTO") § 9.

[2] Joint trial exhibits are cited as "JX #."  I cite to docket items as "D.I. __," Pl.'s Verified Compl. to Compel Inspection of Books and Records (D.I. 1) as "Compl. __," and the Trial Transcript (D.I. 36) as "Tr. __."

[3] PTO § 3, ¶ 2.

[4] PTO § 3, ¶¶ 1, 5.

Non-party, Leon Goldstein, is the sole member and a manager of Georgia Notes.[5] Goldstein maintained a friendship with non-party, Oleg Firer, from 2007 through at least 2019.[6] Firer has served as Net Element's chief executive officer since April 16, 2013.[7]

## B. Debt for Equity Exchange

On January 1, 2014, Firer, on behalf of Net Element, executed a Term Loan Note in favor of Georgia Notes for the principal sum of $13,268,000, with a maturity date of January 1, 2017 (the "Note").[8] Later that year, on September 11, 2014, as part of a debt-for-equity exchange (the "2014 Exchange Transactions"), third-party, Crede CG III Ltd. ("Crede"), agreed to purchase Net Element's long-term debt, including the Note, for the principal amount and interest accrued in the total amount of $13,533,360 (the "Debt Exchange Amount").[9] At approximately the same time

---

[5] JX 41 at 2; Tr. 70:2–70:5.

[6] JX 44 at 5; Tr. 21:3–22:6; Tr. 30:9–30:13.

[7] JX 42 at 48.

[8] PTO § 3, ¶ 3; JX 05.

[9] PTO § 3, ¶ 4; JX 15.

as the 2014 Exchange Transactions, Georgia Notes agreed to cancel the Note for a payment of $10 million, which was a discount of more than $3.5 million.[10]

On September 16, 2014, Firer sent the escrow agent an email outlining the disbursement instructions for the Debt Exchange Amount.[11] Consistent with the terms of the underlying exchange agreement, the total escrow proceeds were $13,533,360.[12] According to the disbursement email, Georgia Notes was to receive $10 million and the remainder of the Debt Exchange Amount was to be distributed

---

[10] JX 13. Goldstein contends that he only agreed to accept a discounted payoff because Firer told him that the most a third party would pay for the note was $10 million, and if Goldstein did not accept this offer, then he would "probably lose the entire amount which Net Element owed to Georgia Notes." Tr. 25:16–25:21. According to Goldstein, he never knew the name of the third party who purchased the Note. Tr. 27:5–27:11. Net Element contends, however, that Crede and Georgia Notes entered into a Note Purchase Agreement dated as of September 11, 2014 (the "Note Purchase Agreement"), that Goldstein's daughter executed the Note Purchase Agreement on behalf of Georgia Notes as the Managing Member, and that Firer acknowledged the Note Purchase Agreement on behalf of Net Element. Defendant Pre-Trial Brief at 6; JX 12 at 3. At trial, Goldstein insisted that his daughter did not sign the Note Purchase Agreement because "she will not talk directly to Firer about business at all. I am the one who's conducting everything. And she will not do anything without me, so she did not talk to Firer." Tr. 73:20–74:3. Ultimately, the resolution of this factual dispute is unnecessary to the outcome here. As discussed below, what is relevant is that Georgia Notes, as creditor, contends that Net Element wrongfully induced it to accept less than what was owed on the Note.

[11] JX 16 at 1.

[12] *Id.*

to four other entities (the "Transferees"), none of which were identified in the Escrow Agreement that was entered into in connection with the 2014 Exchange Transactions.[13]  Goldstein first learned of the amounts paid to the Transferees in September 2020 through discovery taken in unrelated litigation between Goldstein and Firer.[14]

### C. Plaintiff's Inspection Demand

After learning about the amounts paid to the Transferees, Goldstein initiated litigation "against Firer because it's—to me, it was very obvious that my money, the money for my company, went to some other companies."[15]  Approximately six months later, on March 11, 2021, Plaintiff sent a letter to Net Element seeking to inspect Company documents under Section 220 (the "Demand").[16]

According to the Demand, the purpose for the inspection is to "investigat[e] the misconduct committed by Firer as a director and officer of the Company, on or

---

[13] JX 27; JX 16 at 1.

[14] Tr. 30:2–32:14; 41:24–44:5.

[15] Tr. 46:16–46:21.

[16] PTO § 3, ¶ 6; JX 35.

about September 16, 2014, when he required that $3,532,360.00 in funds (the 'Funds'), belonging to the Company or in which the Company enjoyed a beneficial interest," be paid to four entities.[17] The four entities were the Transferees.

Net Elements responded to the Demand on March 18, 2021. It declined to produce the books and records sought because (i) Georgia Notes had failed to state a proper purpose for the Demand; (ii) there was no evidence of possible mismanagement identified in the Demand; (iii) the documents sought in the Demand related to a single transaction in which Georgia Notes was directly involved as creditor and that had occurred more than six years before the Demand was made; and (iv) any claims brought by Georgia Notes or Goldstein would be barred either by the general release both had signed in connection with the 2014 Exchange Transactions or the statute of limitations.[18]

---

[17] JX 35.

[18] *Id.*; JX 40.

### D. Procedural History

On March 22, 2021, Georgia Notes filed its operative Complaint against Net Element under Section 220.[19] The parties submitted pre-trial briefs on August 20, 2021,[20] and the Court convened trial on August 31, 2021.[21] The matter was submitted for decision that day.

## II. ANALYSIS

Section 220 permits a stockholder of a Delaware corporation to inspect the corporation's books and records if the stockholder's demand complies with the statute's form and manner requirements and states a proper purpose for inspection.[22] Net Element does not argue that the Demand failed to satisfy the statute as to form and manner.[23] Instead, the Company argues that Georgia Note's primary purpose for inspection is unrelated to its status or interests as a stockholder.[24] The Company

---

[19] Pl.'s Verified Compl. to Compel Inspection of Books and Records (D.I. 1) ("Compl.").

[20] D.I. 20, 21.

[21] Tr. at 1.

[22] 8 *Del. C.* § 220(c).

[23] Def.'s Pre-Trial Brief (D.I. 20) ("Def.'s Brief") at 16.

[24] Def.'s Brief at 16.

also maintains that Georgia Notes has not come close to satisfying its burden of demonstrating a credible basis to suspect that mismanagement or wrongdoing has occurred.[25]  Finally, the Company asserts that, even if Georgia Notes has proven a proper purpose for inspection, its Demand is still improper because: (i) Georgia Notes and Goldstein expressly released their rights to pursue litigation related to the 2014 Exchange Transactions; (ii) any litigation related to the 2014 Exchange Transactions would be time-barred; and (iii) the Demand for documents is too broad.[26]

For reasons explained below, I agree that Georgia Notes has not proven a proper purpose for inspection.  Accordingly, I need not reach the Company's other grounds to reject the Demand.

According to the statute, a "proper purpose" is "a purpose reasonably related to [the plaintiff's] interest as a stockholder."[27]  In a Section 220 trial, the stockholder plaintiff must prove by a preponderance of the evidence "that [its] primary purpose

---

[25] Def.'s Brief at 23.

[26] Def.'s Brief at 19, 20, 21, 28.

[27] 8 *Del. C.* § 220(b).

as to each category of the [d]emand is proper."[28]  When a corporation has reason to believe the stockholder plaintiff has advanced a purpose that does not reflect its true purpose, the corporation "[u]nquestionably is entitled to challenge the plaintiff's stated purpose and to show that as a factual matter, the plaintiff's true purpose is other than what is stated in the demand."[29]  Likewise, the corporation may resist a demand for inspection when it "establishe[s] factually" that "the plaintiff's demand is made for purposes adverse to the corporation's best interests."[30]

During trial, Goldstein acknowledged he had two purposes for making the Demand.[31]  Both proffered purposes arise from a desire to investigate Net Element's "wrongdoing and other improper conduct" in connection with the 2014 Exchange

---

[28] *Khanna v. Covad Commc'ns Gp., Inc.*, 2004 WL 187274, at *5–6 (Del. Ch. Jan. 23, 2004) (citing *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1031–33 (Del. 1996)).

[29] *Coit v. Am. Century Corp.*, 1987 WL 8458, at *2 (Del. Ch. Mar. 20, 1987); *see also* DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 8.6(g) (2005) (collecting cases).

[30] *Coit*, 1987 WL 8458, at *3.

[31] Tr. 127:17–128:6.

Transactions and subsequent disbursement of funds to the Transferees.[32] One purpose is to obtain information to support a claim that Georgia Notes could pursue against Net Element as a former creditor (the "Creditor Purpose"),[33] and the second is to obtain information to support a claim for a breach of fiduciary duty against Firer, which purportedly would be brought on behalf Net Element Defendant in a derivative action (the "Stockholder Purpose"). According to Georgia Notes, "there [is] nothing to suggest that [the Creditor Purpose] [is] [Goldstein's] primary purpose."[34] I disagree.

---

[32] Compl. ¶ 7(a).

[33] At trial, Goldstein admitted that he believed Firer had defrauded Georgia Notes and that this was "one of the reasons" he was seeking the documents requested in his Demand:

> Q: And you also feel that Mr. Firer defrauded Georgia Notes by never telling you that the purchaser of the promissory note was paying more than $10 million; right?
> A: Right.
> Q: And you feel that that damaged Georgia Notes and cost you $3 ½ million [3.5 million]; right?
> A: Right.
> Q: And that is the purpose why you want to get the documents that you're seeking in this case, correct, because you were defrauded by Mr. Firer?
> A: It's one of the reasons. Tr. 65:16–66:18.

[34] Tr. 128:3–128:5.

Goldstein made clear during his deposition that he sought the Company's books and records because he believes he was defrauded by his one-time friend, Firer.[35]  Indeed, Goldstein revealed his primary purpose when he testified, "I was defrauded by Firer, who is CEO of the company Net Element and was [a] friend of mine. ***That is the purpose of all these investigations***."[36]  He then explained:

> Q.  What did you tell Net Element was the reason that you were asking for the documents?[37]
>
> A.  The reason? Because the money—which, like I said, [was] wired to different companies—$3,533,360 supposed to belong to Georgia Notes [as payment on the Note].  And that's, we feel, a wrongful transaction. We want to find out why this money did not [end] up at Net Element company.[38]

As his testimony reveals, in Goldstein's view, the allegedly missing $3,532,360 belongs to Georgia Notes.[39]  And it belongs to Georgia Notes as

---

[35] Goldstein Dep. 57:19–58:16.

[36] Goldstein Dep. 39:19–40:7; 57:19–58:16 (emphasis added).

[37] Tr. 55:11–55:12.

[38] Tr. 55:13–55:18.

[39] During trial, when referring to the amount that Georgia Notes believes it is owed by virtue of Net Elements (Firer's) wrongful conduct, the parties and Goldstein sometimes pegged the Debt Exchange Amount as $13,533,360 and at other times mentioned

repayment in full on the Note.  Goldstein initiated this Section 220 action on behalf

of Georgia Notes to obtain evidence to support that claim.  While the claim may well

be valid, it is a claim Georgia Notes will assert as a Net Elements creditor, not as a

Net Elements stockholder.  Section 220 is not a tool available to advance non-

stockholder interests and is certainly not a tool to obtain pre-litigation discovery of

claims to be asserted nominally by a stockholder to advance non-stockholder causes

against the Company.[40]

\* \* \* \* \*

The preponderance of the evidence (and then some) demonstrates that, despite

Goldstein's assurances to the contrary, he is seeking the Company's books and

records as pre-litigation discovery to enhance his claim as a creditor with respect to

the Note.  To the extent the Stockholder Purpose is even real, it is clearly secondary

---

$13,532,360.  Tr. 42:10–11, 44:11, 55:15, 55:24, 77:4, 107:3, 113:5.  According to the Pre-trial Stipulation, the Debt Exchange Amount was $13,533,360, the amount paid to the Transferees was $3,532,360 and the escrow agent received $1,000 in fees.  PTO § 3, ¶ 4; JX 14; JX 27 at § 6(e).

[40] *See Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 207 (Del. Ch. 1976) (holding that the stockholder's purpose must "not be adverse to the interests of the corporation"); *Disney v. Walt Disney Co.*, 857 A.2d 444, 450 (Del. Ch. 2004) (same); *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998) (same).

and subordinate to the Creditor Purpose. Since Georgia Note's primary purpose for inspection is to advance its interests as creditor, not as stockholder, the Company's rejection of the Demand was justified.[41]

## III. CONCLUSION

For the foregoing reasons, judgment is entered against Plaintiff in favor of Defendant. Defendant shall submit a form of final judgment to that effect on notice to Plaintiff within ten (10) days.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ Joseph R. Slights III*

---

[41] *See BBC Acq. Corp. v. Durr-Fillauer Med., Inc.*, 623 A.2d 85, 91 (Del. Ch. 1992) (rejecting demand where the purpose for the inspection related to a plaintiff's "status as a bidder," and not "its status as a [] stockholder"); *id.* at 88 (observing, "[s]ince [] a shareholder [seeking to inspect books and records] will often have more than one purpose, [the proper purpose requirement] has been construed to mean that the shareholder's primary purpose must be proper; any secondary purpose, whether proper or not, is irrelevant"). I acknowledge that discerning one's purpose or intent is not a precise exercise and generally is the product of assessing credibility and circumstantial evidence. That exercise has led to the conclusion that Georgia Notes' Stockholder Purpose does not "predominate[] over [its] ulterior purpose." *Helmsman Mgt. Serv., Inc. v. A&S Consult., Inc.*, 525 A.2d 160, 167 (Del. Ch. 1987) (addressing whether stockholder was seeking inspection primarily to advance its interest as stockholder or creditor, and observing that "[t]he issue of whether a concept so elusive as purpose or motive is 'primary' or 'secondary,' involves a judgment that necessarily is qualitative, not mathematical").